IN THE SUPREME COURT OF THE STATE OF DELAWARE

<table>
<tr><td>IN RE MINDBODY, INC.,<br>STOCKHOLDER LITIGATION</td><td>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§</td><td><br><br>No. 484, 2023<br><br>Court Below:  Court of Chancery<br>of the State of Delaware<br><br>C.A. No. 2019-0442</td></tr>
</table>

Submitted:   September 11, 2024
Decided:   December 2, 2024

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en Banc*.

Upon appeal from the Court of Chancery.  **AFFIRMED** in part, **REVERSED** in part.

Lisa Schmidt, Esquire, Robert L. Burns, Esquire, Matthew D. Perri, Esquire, John M. O'Toole, Esquire, RICHARDS LAYTON & FINGER, Wilmington, Delaware.  *Of Counsel*:  Andrew J. Rossman, Esquire (*argued*), David M. Cooper, Esquire, Charles H. Sangree, Esquire, Judrick Fletcher, Esquire, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York.  Matthew Solum P.C., John P. Del Monaco, Esquire, Yosef J. Riemer, P.C., KIRKLAND & ELLIS LLP, New York, New York *for Appellants*.

Joel Friedlander, Esquire (*argued*), Jeffrey M. Gorris, Esquire, Christopher M. Foulds, Esquire, FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware.  Gregory V. Varallo, Esquire, Andrew E. Blumberg, Esquire, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware.  *Of Counsel*:  Jeroen van Kwawegen, Esquire, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York *for Appellees*.

**VALIHURA**, Justice:

## I. INTRODUCTION

This appeal arises from Vista's take-private acquisition of Mindbody in 2019 for $36.50 per share (the "Acquisition"). The Court of Chancery held that Richard Stollmeyer, Mindbody's founder and CEO, breached his "*Revlon*" duties after deciding that he wanted to monetize his Mindbody investment and sell Mindbody to Vista. Stollmeyer and Vista do not challenge any of the trial court's detailed post-trial fact-findings. Stollmeyer initiated the flawed sales process without board authorization and enabled Vista to obtain a headstart and "sprint" ahead of other potential acquirors. He gave the Mindbody board incomplete information about his back-channel communications with Vista. After finding Stollmeyer liable for breaching his *Revlon* duties, the court found him liable for damages of $1 per share. He asks our Court to reverse both the *Revlon*-related liability and damages holdings.

Vista had a contractual right to review Mindbody's proxy materials before they were distributed to Mindbody's stockholders. Vista was obligated to notify Mindbody if it became aware of any facts that, if not disclosed, would render the proxy materials materially misleading or incomplete. The trial court found that Stollmeyer breached his duty of disclosure and that Vista had aided and abetted that breach. The trial court assessed damages of $1 per share against Vista and Stollmeyer for that violation as well but ruled that Plaintiffs were only entitled to one recovery of $1 per share. Vista and Stollmeyer challenge these holdings along with the court's subsequent ruling that Defendants waived their right to any settlement credit.

This appeal followed.

2

We hold the following. First, we affirm the trial court's holding that Stollmeyer breached his fiduciary duty of loyalty under *Revlon* by having disabling conflicts and tilting the sale process in Vista's favor for his own personal interests in ways inconsistent with maximizing stockholder value. Second, we affirm the trial court's determination that Stollmeyer breached his fiduciary duty of disclosure by allowing material omissions in Mindbody's proxy materials. Third, we reverse the trial court's holding that Vista aided and abetted Stollmeyer's disclosure breach. Fourth, we affirm the trial court's award of damages for Stollmeyer's *Revlon* breach. Finally, we affirm the trial court's holding that Appellees waived their right to seek a settlement credit under DUCATA by failing to timely raise the issue below. Because we reverse the aiding and abetting determination, we do not reach the issue of the trial court's award of disclosure damages.

## II. *FACTUAL BACKGROUND*

The trial record consists of 1,865 joint trial exhibits, trial testimony from eighteen fact and six expert witnesses, deposition testimony from twenty-four fact witnesses, and 123 stipulations of fact in the pre-trial order. This opinion recites the facts, substantially verbatim, as the Court of Chancery found them after trial.[1]

### A. The Parties

Defendants-Below Appellants are Richard Stollmeyer, Vista Equity Partners

---

[1] *See In re Mindbody, Inc., S'holder Litig.*, 2023 WL 2518149 (Del. Ch. Mar. 15, 2023). Because the parties do not challenge any of the trial court's factual findings, we also accept them as the foundation for our legal analysis. For readability, the portions of the Court of Chancery's fact-findings in this "Factual Background" section that are taken substantially verbatim from the Court of Chancery's post-trial opinion appear after headings II.A.1 – II.S, which are in bold font.

Management, LLC ("Vista"), and Mindbody.[2]

Plaintiffs-Below Appellees are Luxor Capital Partners, L.P., Luxor Partners Offshore Master Fund, LP, Luxor Wavefront, LP, (collectively "Luxor"), and Lugard Road Capital Master Fund Master Fund, LP.

### 1. Stollmeyer Is Ready To Sell

Stollmeyer grew Mindbody into a software-as-a-service ("SaaS") platform that serves the fitness, wellness, and beauty industry. Stollmeyer took Mindbody public in 2015. By 2018, Stollmeyer had grown Mindbody to over $1 billion market capitalization, yet Stollmeyer had never experienced a big liquidity event. He had made substantial financial commitments in the meantime. Stollmeyer had (i) invested nearly $1 million into his wife's wellness company, (ii) invested at least $300,000 into "Stollmeyer Technologies, LLC," (iii) loaned his brothers and his former business partner money for their own real estate purchases, and (iv) pledged $3 million to a local college, of which $2.4 million was unpaid.

Stollmeyer described his unhappiness with his pre-Merger financial situation in a post-Merger interview for Alejandro Cremades's "dealmakers" podcast. During the interview, Stollmeyer described how "98% of [his] net worth" was "locked inside" Mindbody's "extremely volatile" stock, while Stollmeyer could only sell "tiny bits" of his stake in the public market under his 10b5-1 plan. Stollmeyer described those sales as "kind of like sucking through a very small straw."

---

[2] When addressing the proceedings below, we refer to Appellants as "Defendants" and Appellees as "Plaintiffs."

4

. . . .

In February 2018, Stollmeyer asked his financial advisor to "estimate [his] cash position" in light of his impending expenses. Stollmeyer stated that the timing and amount of his 10b5-1 sales were "top of mind" because of "greater than expected H1 cash outlays[.]" To meet his commitments, Stollmeyer had to "dig[] into [his] LOC [line of credit]."

. . . .

At trial, Stollmeyer denied that he needed liquidity in early 2018. To bolster his testimony, Stollmeyer introduced testimony from his financial advisor and from an expert on executive compensation. The trial court found that Stollmeyer's own pre-litigation and intra-litigation statements reflecting his personal and financial circumstances were far more persuasive than his trial testimony or the testimony of other witnesses.

Stollmeyer was motivated to sell in 2018. He held shares of super-voting Class B stock that would automatically convert to shares of common stock in October 2021. As of 2018, those shares enabled Stollmeyer to control 19.8% of Mindbody's fully diluted voting power, giving him the second largest block of votes. After October 2021, those same shares would carry less than 4% of the Company's fully diluted voting power. Tactically, it was best for Stollmeyer to move before the October 2021 sunset. Further, Mindbody's largest stockholder— IVP—faced the same sunset provision and was looking to exit. If that happened, then the Board seat held by IVP's nominee, Liaw, would likely transition to a representative from Luxor. Stollmeyer had spoken with both firms. He knew that IVP wanted a near-term sale, while Luxor did not. It behooved Stollmeyer to strike while his

5

major ally also held a position of power.

Additionally, Stollmeyer was exhausted by the struggles that Mindbody faced during 2018. The Company made two strategic acquisitions at the beginning of the year: FitMetrix, a company that integrated workout equipment and wearable fitness trackers with performance feedback technology, and Booker, a cloud-based business management company for salons and spas. Mindbody also shifted its sales strategy to focus on high-value customers. In addition to integrating the acquisitions and reorienting the sales strategy, Stollmeyer was simultaneously serving as the CEO and CTO of Mindbody after the Board terminated the CTO in April. During trial, Stollmeyer testified at length about the difficulties he faced. He stated that by late 2018, he was "physically and emotionally exhausted[.]" Understandably, he wanted out.

### 2. *Mindbody's Largest Stockholder Is Ready To Sell*

In 2018, the Company's largest stockholder was IVP, a venture capital investor that had held Mindbody super-voting Class B stock shares since the Company's IPO in 2015. Through a combination of super-voting Class B stock and regular Class A stock, IVP held shares carrying approximately 24.6% of the Company's voting power. Together, IVP and Stollmeyer controlled over 44% of the Company's voting power. After October 2021, however, the Class B stock would automatically convert into Class A, and IVP's share of the Company's fully diluted voting power would fall to 6%.

Liaw served as IVP's representative on the Board. No other institutional investors enjoyed representation on the Board. Liaw was one of IVP's eight general partners and thus owed fiduciary duties to IVP. That meant that if IVP wanted a near-term sale, then Liaw

6

had a fiduciary duty to IVP and its investors to pursue a near-term sale. But if a near-term sale was not in the best interests of the Company, then Liaw also had a fiduciary duty as a director of the Company not to pursue a near-term sale. Liaw's position was rife with the potential for conflict.

In March 2018, Liaw emailed Stollmeyer that IVP "may be contemplating a disposition" of its Mindbody stock. IVP had internal reasons to exit. By August 2018, IVP's position in Mindbody reflected an unrealized gain of $68 million. During a meeting on August 13, IVP's partners "agreed to target at least $200M in additional liquidity by year end." Mindbody was listed as one of five positions that would contribute to meeting this goal, and Liaw was directed to "evaluate/recommend evaluate [*sic*] distributing 50% of position by 12/15[.]"

### 3. The Other Mindbody Directors

In addition to Stollmeyer and Liaw, there were six other members of the Board: Katherine Blair Christie, Court Cunningham, Gail Goodman, Cipora Herman, Adam Miller, and Graham Smith.

. . . .

### 4. Mindbody's Prospects

The directors testified that when Mindbody embarked on its sale process, they viewed its prospects as highly uncertain for many reasons. For starters, the integration of FitMetrix and Booker had been rocky. Herman recalled participating in a Q2 2018 guide-down based on a reduction in sales productivity "during this integration period." The Company's CFO, Brett White, testified that the investments were underperforming. In

7

contemporaneous statements to the Board and the Company's investors, however, Stollmeyer expressed optimism about these investments. At Mindbody's annual analyst conference in September 2018, he declared in his presentation slides that "The Integration is Working." Goodman also believed the investments would pay off.

The directors also cited the shift toward high-value customers. Cunningham testified that the optimism about high-value subscribers "ended up not panning out over the subsequent year [2018]." Liaw and White testified that Mindbody's high-value subscribers had declined in 2018 for two quarters in a row. The contemporaneous documents painted a different picture, with White's slides at the same conference proclaiming "Our Customer Base is Healthier than Ever" and "Subscriber Base Shifting To Higher Priced Tiers."

Mindbody's results for Q3 2018 were mixed. The highlights were an increase of 19% in year-over-year average revenue per subscriber and the first organic increase in net new subscribers in two years. The lowlights included a revenue miss of $2.4 million against Mindbody's internal plan and $0.2 million against the analyst consensus.

The consensus view was that if Mindbody could weather a year or so of challenges, then the future was bright. Stollmeyer estimated in October 2018 that "[f]ull realization of the synergies" from the Booker and FitMetrix acquisitions "will take 1–2 years." At trial, he confirmed that expectation. By October 2018, Goodman "absolutely believed the investments would pay off" and saw no need for cash infusions.

At trial, Stollmeyer and Vista sought to show that because of the risks that the Company faced, the Board viewed a sale as the best option for stockholders. The trial court

8

found support for that conclusion in the record. Yet, for the trial court, crediting that the Board reached that conclusion did not require crediting that the Merger was the best transaction reasonably available, and that was because of how the sale process played out. The Board comprised many talented individuals, but only Goodman had any experience selling a public company. The Company's outside counsel described the Board as "super green" and recommended thorough training regarding what a process would entail.

At the time the Board embarked on a sale process, the Board was not aware of the conflicts afoot. Although Defendants proved that the Board knew that Stollmeyer wanted to resign as CEO within two to three years, the Board did not know that he wanted to sell the Company sooner or that IVP was in lockstep with Stollmeyer toward this goal. Stollmeyer did not disclose his need for liquidity to any Mindbody director at any time during the sale process. Neither Stollmeyer nor Liaw disclosed IVP's desire to exit. As found by the trial court, Stollmeyer concealed many of his interactions with Vista from the Board.

### B. Events Before The Board Process

On August 7, 2018, Stollmeyer met with Jeff Chang, an investment banker with Qatalyst Partners. Stollmeyer and Chang had been meeting from time to time over the course of five years. Chang testified that before August 2018, Stollmeyer "had never been open-minded to having dialogue" with private equity. During the August 7 meeting, however, something was different, and Stollmeyer was "more open to having a dialogue." Stollmeyer had kept in contact with a couple of private equity shops. Before Mindbody's IPO, Vista and Thoma Bravo had each approached Mindbody about an

9

acquisition. Stollmeyer thought they would be good places to start. Chang had a good relationship with Vista. He had sold about four or five companies to them and advised Vista or its affiliates. Monti Saroya, a Vista principal, had been involved in transactions where Chang represented the seller.

### 1. Qatalyst Reconnects Stollmeyer And Vista

During the August 7 lunch meeting, Chang offered to reconnect Stollmeyer to Vista. Immediately after lunch, Chang did so by email. Chang wrote to Saroya:

> I was with Rick [Stollmeyer] today, . . . . I know you all have met before but thought a direct thread might be helpful to get you, Brian [Sheth] and Rick together some time in the future. Nothing pressing, but thought it'd be helpful for you all to meet.

Saroya responded about seven minutes later to set up a meeting. Shortly after, Chang forwarded the email chain to George Boutros, a senior partner at Qatalyst. In the forwarding email, Chang provided the following report:

> Known them [Mindbody] since pre-IPO and founder/CEO [Stollmeyer] has never wanted to sell. Vista and Thoma [Bravo] tried to acquire them pre-IPO.

> Met with him [Stollmeyer] today and he immediately talked about how he is tired of being public and wanted me to re- connect him w[ith] Vista and Thoma. Probably a 2019 deal is my guess.

By 7 p.m. that same day, Saroya and Stollmeyer had scheduled a meeting for "late Aug/ early Sep."

Chang waited a week to connect Stollmeyer with two other private equity firms, Thoma Bravo and Hellman & Friedman ("H&F"). Stollmeyer did not meet with those firms until mid-October and early November.

10

### 2. *Stollmeyer Takes Luxor's Temperature*

On August 9, 2019, two days after reconnecting with Vista, Stollmeyer met with Luxor, which had owned shares of Mindbody since 2016. By August 2018, Luxor had accumulated a 14% stake in the Company, but Luxor did not fit the mold of an "activist" investor. Luxor did not seek to take control of companies. It was not in the habit of demanding to inspect books and records of its investments. And it had not petitioned for appraisal or sought to be lead plaintiff in a representative action before this lawsuit.

Stollmeyer wanted to know where Luxor stood on a sale. If IVP followed through on its stated intention to exit, Luxor would be Mindbody's largest public investor. Even if IVP did not exit, Luxor would become Mindbody's largest investor as soon as the super-voting Class B shares converted to Class A in October 2021.

. . . .

Stollmeyer had met with Luxor as recently as June 2018. At that point, the discussion focused on having Luxor's Doug Friedman join the Board. Stollmeyer was initially receptive to the idea, as he expected Liaw to be leaving his position on the Board, making room for an alternative institutional stockholder representative. By the August 9 meeting, however, Stollmeyer's tune had changed, and he wanted to know whether Luxor would support a sale. Friedman responded that Luxor would not support a near-term sale because Luxor expected much higher return over the long term.

Concerned about resistance to a sale, after the August 9 meeting, Stollmeyer instructed one of Mindbody's long-time advisers, David Handler of Centerview Partners LLC ("Centerview"), to create a comprehensive dossier on Luxor, including any activist

11

campaigns.

### 3. *Stollmeyer Meets With Vista*

On September 4, 2018, Stolleyer met with Saroya and another Vista representative, senior vice president Nicolas Stahl. Saroya and Stahl were the lead Vista representatives for the Mindbody deal.

Saroya and Stahl testified at trial that they did not recall the specifics of the September 4 meeting. Stahl, however, prepared a contemporaneous summary of the meeting consistent with Vista's practices. It stated:

> We met with Rick [Stollmeyer]. Rick mentioned he would like to find a good home for his company. He is getting tired and expects to stay in his seat 2-3 more years. He has 2 folks (one from Booker acq[uisition]) that he thinks could succeed him.

During the meeting, Saroya invited Stollmeyer to join them for the CEO dinner at Vista's CXO Summit. Saroya did not remember any of those details. He recalled that they "talked about how excited he is for the market, how well Mindbody has done historically, and how he thinks Mindbody has a bright future."

Stollmeyer did not have Board authorization to disclose that he was planning to step down in two or three years or that he had two people in mind to succeed him. After the September 4 meeting, Stollmeyer did not tell the Board that he had disclosed this information to Vista. Stollmeyer admitted that he did not provide this information to any other potential acquirers in August, September, or October 2018.

The fact that Stollmeyer told Vista that he was looking for a "good home" for Mindbody was a bad fact for Defendants. It indicated that Stollmeyer had tipped off Vista

12

that Mindbody was considering a near-term sale and that Stollmeyer would be leading the process. Stollmeyer denied it at trial. He asserted that he never would have used the words "good home," claiming "the idea that I was looking for something like that and I would say that to them, it just doesn't feel like something I would say. I don't recall saying it." He also said that he would never refer to Mindbody as "my" company. That testimony was not credible. As to finding a "good home" for Mindbody, Stahl used this "home" terminology describing Stollmeyer's position in not one, but two contemporaneous documents. As to calling Mindbody "my company," Stollmeyer used this exact terminology during his post-Merger podcast interview with Cremades. The trial court found that more likely than not, Stahl's notes of the meeting provided an accurate account of what occurred.

### 4. Stollmeyer Gives The Board A Partial Account Of His Meeting With Vista

At an informal Board dinner in Santa Monica on September 5, 2018, Stollmeyer advised the Board that he had met with Vista, but he did not give a full report on the meeting. He did not report on his discussion with Qatalyst about a potential sale. The Board instructed Stollmeyer to keep them in the loop, not get "too far advanced" in his conversations, and to "get smart on the topic" of selling the Company. That was also the day that Centerview provided Stollmeyer with the dossier on Luxor.

The Board meeting that followed on September 6 was seemingly uneventful. The minutes reflect that members of management presented on Mindbody's growth, retention, and integration performance. White covered Q2 highlights, areas of growth, and

13

management's second-half outlook.  The minutes did not mention Stollmeyer's meeting with Saroya and Stahl, nor the invitation to attend the CXO Summit.

A few days later, on September 9, Handler copied Stollmeyer on an email to Mindbody's Chief Legal Officer, Kimberly Lytikainen, asking for a meeting to "discuss the various elements of dealing with the Luxor situation."  On September 10, Stollmeyer asked Centerview to "add an analysis of my voting power if I exercised all of my vested options as of the end of the year."  Centerview provided this information on September 17.

### 5.  *Stollmeyer Attends Vista's CXO Summit And Is "Blown Away"*

Vista's CXO Summit is an annual gathering of senior executives from Vista portfolio companies and select industry guests.  Vista uses the conference to prospect for acquisition targets.  Saroya testified that the CXO Summit gives CEOs from potential targets "a flavor of what it feels like to work for Vista" and helps "take away the myth that [Vista] might be a slash-and-burn shop."

Stollmeyer accepted Saroya's invitation to attend the CXO Summit on October 9.  At the summit, he met with executives from Vista portfolio companies.  After the first day, Stollmeyer texted Saroya to ask for a one-on-one meeting with Vista's founder Robert Smith, Vista's President Brian Sheth, or Vista portfolio company CEO Reggie Aggarwal. Stollmeyer asked Vista to put him in touch with Aggarwal because he wanted "to know what it's like to sell to Vista as a founder."  Stollmeyer pitched Mindbody to Robert Smith in a brief meeting on October 9.

Stollmeyer watched presentations from both Robert Smith and Sheth at the summit. Smith's presentation included estimated wealth creation for CXOs who took their

14

companies private with Vista and noted that Vista portfolio company executives had earned $488.6 million since 2017.

Stollmeyer texted Saroya that the "[p]resentations are very impressive." He texted Mindbody's President, Michael Mansbach, that the presentations are "mind blowing/inspiring." Stollmeyer told Mansbach later that day that Vista "really love[s] me, I love them." Stollmeyer also told Mansbach that the CXO Summit helped him "center on what is nagging from my subconscious." Stollmeyer sent Mansbach a series of screenshots, which Stollmeyer described as "money shots," from a presentation that Sheth gave. Two of the screenshots focused on Vista's 2016 acquisition of Marketo for $1.8 billion and subsequent sale of Marketo in 2018 for $4.75 billion. At trial, Stollmeyer admitted that Marketo made an interesting parallel to Mindbody and that Marketo was "purchased by Vista and then Vista sold them in a fairly short order . . . with a really strong return." Friedman testified that Stollmeyer later touted to Luxor "that Vista had bought [Marketo] and then sold it 18 months later for 3x the price." Stollmeyer would later tell his financial advisor that, after a sale to Vista, "he could make as much money over the next three years as he did the first go around."

Stahl set up a meeting between Stollmeyer and Aggarwhal. In a text to Aggarwal on October 9, Stahl explained that Stollmeyer wanted "to know what it's like to sell to Vista as a founder." Stahl's text also used the concept of a "home" for Vista, adding that Stollmeyer "is hyper focused on maintaining culture and ensuring his business finds the right home that will accelerate growth, not cause it to falter."

The Board was aware that Stollmeyer was attending the CXO Summit, but

15

Stollmeyer did not have Board authorization to tell Vista that he was focused on finding a home for Mindbody. Stollmeyer never told the Board that he had done so.

The CXO Summit changed the way Stollmeyer viewed a sale to a private equity firm, or at least a sale to Vista. He explained: "what I saw there really shifted my paradigm a bit on how private equity operates. Classically, you think of private equity firms as purchasing companies and kind of stripping out the investments to yield maximum cash flow." Centerview's Handler agreed that the CXO Summit changed Stollmeyer's perception of private equity and that Stollmeyer saw Vista as "his solution." Consistent with his text to Mansbach, Stollmeyer admitted at trial that he left the CXO Summit with the impression that Vista really loved him and he loved them. Vista felt the same, touting internally that Stollmeyer "loved" them and that they "built a strong relationship with [Stollmeyer]."

After the CXO Summit, Vista began drafting a memorandum about Mindbody for its Investment Committee, the group tasked with deciding whether to approve or reject an acquisition. The draft recounted Stollmeyer's attendance at the CXO Summit and noted that Stollmeyer "mentioned to Nicolas how impressed he had been with Robert [Smith] and Vista's vision, reiterating his intention to explore a take-private for Mindbody." Stollmeyer conceded at trial that he did not have authorization to tell Vista in mid-October 2018 that he intended to explore a take-private for Mindbody.

### 6. *Stollmeyer Works With Qatalyst To Kick Off A Sale Process*

After the CXO Summit, Stollmeyer became laser focused on a sale to Vista. On October 11, 2018, Chang and Stollmeyer discussed beginning "preparatory work prior to

16

kicking off a process for Mindbody[.]" Stollmeyer asked Chang to provide references for Vista. Chang provided two, one of whom had sold his company to Vista in a deal where he was represented by Qatalyst.

In that same email, Chang cautioned Stollmeyer that whenever Vista asked Mindbody for non-public information, Stollmeyer should confer with Chang "because it is at that juncture they will use their ability to move quickly to their advantage[]" and "it is very important to get the right 'process' and messaging from the start to optimize for value." Stollmeyer later commented that "[t]his advice proved to be prescient and important."

### 7. *Vista Expresses An Interest In Acquiring Mindbody*

On October 15, 2018, Saroya called Stollmeyer, and the two spoke for twenty-five minutes. During the call, Saroya delivered an oral expression of interest to acquire Mindbody. Saroya told Stollmeyer that Vista would pay a substantial premium to Mindbody's recent trading price, which closed at $33.27 on October 15. Stollmeyer understood that Vista saw Mindbody's recent stock correction as a buying opportunity. At trial, Stollmeyer testified that he told Saroya that Mindbody was "not for sale" but that he would relay Vista's interest to the Board. The trial court noted that those statements do not take twenty-five minutes to say.

### 8. *Vista Initiates Its Internal Process*

Vista was a pro at acquiring companies. As Chang had warned Stollmeyer, Vista's advantage is speed. Vista likes to engage "in significant background work" and is "[p]ro-active in making friendly unsolicited approaches and prefer[s] to kick-off processes vs.

17

reacting to outreach." Vista then capitalizes on its ability to "move very quickly through both business and confirmatory diligence" and leverages its early analysis "to truncate processes and reduce the ability for other potential acquirers to be able to complete diligence and provide certainty at the finish line[.]" The record at trial involved precedent transactions in which Vista used this strategy, and Vista representatives testified about the strategy and its competitive advantages. In internal communications, Vista representatives call it "Sprinting," capitalizing the word as if it were defined term.

Vista deployed its go-early-and-fast strategy after the CXO Summit. Stahl texted Saroya on October 11, "MB down another 6% today. Thoughts on going to IC next week to get a hunting license?" Saroya then texted Stahl on October 14, suggesting, "[l]et's get the list of stuff we need from MB ready. I'm going to try and catch [Stollmeyer] tomorrow and tell him I want to send him the list ASAP and get going." Stahl texted a fellow Vista deal team member on October 14:

> I've been back and forth with Monti today and we are likely going to Sprint hard on Mindbody (they have now engaged a banker) and may be trying to sign a deal in the next 2-3 weeks. Would it be possible to upgrade / add to our team to enable us to Sprint?

When presented with these texts at trial, Saroya agreed that Vista was "gearing up and trying to push hard to get to a signing very fast."

Initially, Vista set a goal of signing an agreement before the Company's next earning's call, which was fewer than three weeks away. On October 14, 2018, Stahl texted Vista deal team member Derek Klomhaus that "Monti wants to announce before their earnings. What day is that in November? Have Mike add to all of our calendars

18

(incl[uding] Monti)." On October 15, Stahl texted Saroya suggesting that "even if the earnings call is 10/25, we could still Sprint to sign beforehand." Vista's goal was to "try to get ahead of" any competitors in the Company's sale process.

Vista also gamed out ways to block other bidders. As early as October 15, Stahl noted that Vista's outside counsel was already "thinking through how to reduce interloper risk/goshop risk." Chang wanted to reach out to other companies before Vista could act.

Vista started requesting a market study — a third-party analysis of a particular market for an acquisition. On October 19, Stahl texted Saroya to ask permission to conduct a market study on Mindbody. Saroya texted back "yes" in less than thirty seconds, and Vista retained Bain & Co. to conduct the study. A typical market study takes between two to five weeks to complete, so it was an advantage for Vista to request it before the Company launched its sale process. The study was expensive—the final price tag for the four-week analysis was $960,000—so Vista would not have contracted for it without some confidence that Mindbody would be running a sale process.

### 9. Stollmeyer Tells His Team About Vista's Interest

While Vista was revving up its internal process, Stollmeyer began dribbling out news about the expression of interest. Stollmeyer told his management team first. On October 17, 2018, Stollmeyer sent an email to Mansbach, White, and Lytikainen with the heading "Highly Confidential – For Your Eyes and Ears Only. Do not forward or discuss outside this group without my permission[.]" Stollmeyer relayed Vista's expression of interest and that Vista "would pay a substantial premium to recent trading range and see the stock correction an opportunity."

19

Stollmeyer tried to give his team some comfort, stating that he believed that a private equity sale might be Mindbody's best option to achieve its long-term vision, but that a sale would not be an "automatic 'exit'" for management. Overall, Stollmeyer seemed excited about a deal with Vista and described the possibility as "lean[ing] into an acquirer who sees our current capabilities, gets our huge potential, and has the resources to accelerate our results over the 3 year planning window, and expedite the full realization of what[*sic*] our Vision and Purpose."

Stollmeyer told the email recipients that he "plan[ned] to socialize this possibility to the Board [of] Directors individually over the next week" and further said "[p]lease do not hint or otherwise discuss with them or anyone else until I have a chance to do so and give you the green light." Stollmeyer acknowledged that the "conversation" with Vista was "progressing rapidly."

Next, Stollmeyer told Liaw of Vista's expression of interest during an hour-long conversation on October 18. Liaw texted Stollmeyer later that same day, asking him to "[p]lease keep me posted on the other conversations." Stollmeyer replied that he appreciated hearing Liaw's perspective and "our alignment on the key elements."

On October 19, before he had spoken with any Board member other than Liaw, Stollmeyer spoke for thirty-one minutes with Andre Durand, the founder and CEO of a company that sold to Vista. Durand was one of the two references that Chang had provided for Qatalyst.

Stollmeyer testified that Durand was incredibly positive about his experience with Vista on this call. Durand reported to Saroya that the conversation turned out to be a

20

reference call for Vista." Saroya replied, "Yup I was aware[.]" Stollmeyer did not tell the Board about his conversation with Durand.

### 10. *Stollmeyer Informs The Other Directors Of Vista's Interest*

Stollmeyer waited until October 23—eight days after Vista's expression of interest—to begin contacting the remaining Board members. When he spoke with the directors, Stollmeyer omitted key elements of his discussions with Vista and key pieces of information that he had shared with his management team.

Four of Mindbody's six outside directors—Cunningham, Goodman, Herman and Smith—testified at trial. All four admitted that they were unaware of key facts as of October 23. They agreed that none of them knew about IVP's desire for a near-term exit. To varying degrees, they agreed that they did not know that Vista viewed the downturn in Mindbody's stock price as a buying opportunity or that Vista planned to make an offer based on a premium over the Company's trading price, which meant that a further downturn in the Company's stock price would result in a lower bid. The directors' testimony also indicated to the trial court that they did not know that Stollmeyer had already interacted with Vista on multiple occasions, had spoken with a portfolio company CEO about his experience selling to Vista, and had told Vista that he planned to step down in two to three years.

### C. *The Formal Sale Process Begins*

During a regularly scheduled Board meeting on October 26, 2018, the Board discussed Vista's expression of interest and whether to form a transaction committee to explore a potential acquisition (the "Transaction Committee"). This portion of the meeting

21

occurred in executive session. Stollmeyer remained present, but other members of management were excused.

At some point on or before October 26, Stollmeyer asked Liaw to serve as chair of the Transaction Committee, and Liaw agreed. During the meeting, Liaw started acting like the chair, and everyone else went along. The other Board members did not know when or how Liaw became the presumptive chair of the committee. Goodman testified that Liaw's role as chair was just "assumed" at the October 26 board meeting. The Board did not know at that time that IVP was looking to exit and therefore did not discuss whether IVP's interest in selling would affect Liaw's ability to consider strategic alternatives independently.

. . . .

The Board created the Transaction Committee by unanimous written consent on October 30, 2018. Its members were Liaw, Goodman, and Cunningham, with Liaw as chair. The Transaction Committee's initial mandate was to interview financial advisors and make a recommendation to the Board on whether to engage one or more financial advisors to assist in reviewing strategic alternatives. That was it.

On October 31, the Transaction Committee met with Mindbody's Chief Legal Officer and outside counsel who advised the Board on a regular basis. Among other things, the committee members reviewed the initial expectations, their mandate, and set the date of November 14 to interview potential financial advisors. During a closed session of the meeting that excluded Stollmeyer and other management members, the Committee discussed

> the importance of establishing a process . . . that was independent and free

22

of any influence from members of management or other directors who, depending on the circumstances, could have (or could be viewed to have) a potential conflict with respect to any specific financial advisor or potential strategic partner.

Toward that end, the committee requested sample "'neutrality' guidelines to serve as a framework for ensuring that management understood its role in any potential process." With the assistance of outside counsel, the Transaction Committee prepared "guidelines for communications, potential conflicts and disclosure matters" (the "Guidelines"). The Guidelines required management to obtain "authorization for outbound communications to potential strategic parties or financial advisors, timely reporting of indications of interest or strategic inquiries to the board or Strategic Transaction Committee and flagging any potential conflicts."

The Transaction Committee adopted the Guidelines during the October 31 meeting, and Lytikainen emailed the Guidelines to the Board on November 2. Stollmeyer received and reviewed the Guidelines.

## D.    The Company Lowers Guidance

During late October and early November, the Company was preparing to release Q4 guidance. Investors watched the Company's guidance closely, and the stock price had a history of reacting to it.

Mindbody had been struggling to hit its publicly disclosed targets throughout 2018. In the first half of 2018, Mindbody revised its 2018 full-year guidance to well below Street expectations. And at the end of Q2 2018, Mindbody reduced the midpoint of its full-year revenue guidance by approximately $1 million. During the second half of 2018, Mindbody

23

continued to miss targets. Its Q3 revenue ($63.8 million) missed the midpoint of Mindbody's already-reduced Q3 revenue guidance ($64 million). By September 2018, Mindbody's internal Q4 revenue forecast stood at $69.40 million, down from May's $72 million forecast.

By October 2018, Mindbody's Q4 revenue forecast had slipped to approximately $68 million. On October 26, White provided the Audit Committee a "first pass, preliminary view of Q4'18 guidance" of $65–$67 million against a forecast of $67.8 million. On November 2, Mindbody's head of financial planning and analysis ("FP&A"), Craig Heinle, advised that his best estimate had risen to $67.8–$68.2 million.

Stollmeyer felt that because of the Company's prior difficulties meeting estimates, the Board and the FP&A team "had now swung the pendulum to being overly conservative." Stollmeyer wanted to "guide to the closest thing we could to our reality." On November 5, Stollmeyer emailed Gold and members of the Mindbody management team that he had "never played a game of lowered expectations" and that "[i]f I change my tune now, that would be inauthentic and disheartening. It would also sound weird to those who know me." On the morning of November 5, after digging into the forecast, Stollmeyer suggested guiding to $67–69 million. That evening, however, Stollmeyer and White presented a revised forecast of $68.1 million and a revised proposed guidance range of $66–68 million, for which "the mid point would give us $1.1M in cushion."

The revised guidance range of $66–68 million was conservative. The $1.1 million cushion between the forecast and the midpoint of the guidance was more than the previous quarter, even though management was unusually confident because the October flash

24

report was "basically spot-on." There was only $305,000 of risk in the forecast, meaning that management did not foresee a scenario in which revenue would fall below $67.5 million. Adjusted for high, medium, and low probability risks and opportunities, the forecast was greater than $68 million across the board.

The Audit Committee convened by phone the evening of November 5. Audit Committee members Liaw and Herman were present, along with Stollmeyer and White. Committee chair Smith had signed off on guiding $66–68 million before the meeting. Liaw favored lower guidance because "the only way to rebuild [credibility] or start to rebuild that is to show that [Mindbody] can hit, and ideally beat, future guidance." Herman agreed that guidance should position Mindbody to "beat and raise." They recommended guidance of $65–67 million.

Stollmeyer and Liaw spoke immediately after the Audit Committee meeting for sixteen minutes. Three minutes after hanging up with Liaw, Stollmeyer texted White that he was "adding a new second paragraph in [his] script noting our challenges." Later that night, Stollmeyer circulated the revised script to his management team. He deleted the portion of his script that noted Mindbody's substantial progress integrating Booker. He pulled other "good stuff" from his script, deciding to "save [it] for future use."

Stollmeyer led the November 6 earnings call during which Mindbody announced its Q3 revenue miss and issued Q4 guidance of $65–67 million. He threw "Booker under the bus" and referred to management's failed execution, noting that "we've been humbled by the last couple of quarters in dealing with the magnitude of integrating these businesses and ramping up growth at the same time." Centerview employees observed in real time

25

that Stollmeyer "sounded too apologetic [and] strange." Friedman recalled Stollmeyer sounding "depressed" and listened to the call "in shock."

After the earnings call, Mindbody stock fell 20%—from a November 6 close of $32.63 per share to a November 7 close of $26.18 per share. The stock fell so far that Stollmeyer suggested to Liaw that Mindbody buy back shares.

Plaintiffs argue that Stollmeyer lowered guidance to depress Mindbody's stock price and make a deal seem more attractive. Certainly, Stollmeyer knew the guidance could affect the stock price. He told White and Mansbach a few days earlier that "a few hundred thousand of Q4 revenue makes a huge difference [on] Tuesday," and he testified that guiding $1 million higher would have affected Mindbody's stock price. When asked at trial whether he was considering how guidance could impact the sales process, Stollmeyer acknowledged that, "a low guide, I certainly knew, was going to be a really unfortunate message to send to potential acquirers as we were talking to them and trying to rev up their excitement about our company."

Liaw also knew that lowered guidance would make a sale more attractive. He and a colleague discussed that "the PE guys will drag it out if they think we will miss numbers." Liaw later suggested to Goodman that lowering Q4 guidance would facilitate a sale, explaining that "if we are missing [guidance] they will slow roll us. Hence good to guide down as far as we did." During his deposition, Liaw claimed that his recommendation to lower Q4 guidance was not in any way based on the prospective sale process. He withdrew this statement at trial and admitted that the sale process was not "completely absent from my mind." He testified, however, that his "primary focus" when the Company lowered

26

guidance "was figuring out how the company could start to rebuild credibility."

The trial court found that the facts surrounding the Q4 guidance were murky. They reflected both a desire to establish a figure that the Company could hit and a recognition of the effect that low guidance would have for the attractiveness of a sale.

### E.    Qatalyst Tips Vista About Stollmeyer's Target Price

The drop in Mindbody's stock price after the November 6 earnings call caught Vista's attention. Vista equated a lower stock price with a lower deal price, leading to a greater profit in a future exit. Vista had recognized huge gains on software companies by purchasing them when they experienced stock price "dislocation," then selling on the "rebound."

On the evening of November 6, Stahl texted Saroya about Mindbody's stock drop: "MB down 16% after earnings." Stahl asked, "Should we sprint?" He also asked if Saroya had heard anything from Chang. Saroya called Chang and spoke for five minutes.

After the call, Saroya texted Stahl that "Jeff [Chang is] all over it" and that *"[h]e wants 40 min."* Saroya then inquired about the implications of a $40 per share price for Vista's financial model, which Stahl had just reported was "in good shape," and Stahl responded that Vista "can lean in to get there," and that it would be easier to do so if Vista assumed a "7x+ exit multiple" rather than the "6x forward" they were currently running. In other words, Stahl explained to Saroya how to make it work under the model to pay $40 per share for Mindbody.

The statement that "he wants 40 min" received a great deal of attention at trial. The trial court found the clear implication of this text to be that the pronoun ("he") referred

27

to Stollmeyer, and that Chang tipped Vista that Stollmeyer wanted a deal price of at least $40 per share. Other contemporaneous evidence showed that Stollmeyer wanted a deal price of at least $40 per share. Stollmeyer had implied it in mid-October when he described the expression of interest to his management team and wrote that Vista was willing to pay a "substantial premium" over Mindbody's stock price after it closed at $33.27 per share. Chang said it in mid-November, writing internally that "Rick's bogey is $2bn," which equates to $40 per share. Liaw said it in mid-December, telling Goodman and Cunningham that he was "modestly concerned that Rick still seems *focused on a 4-handle* by year end." The trial court found that that was deal talk for at least $40 per share.

Chang's pricing tip to Vista was a bad fact for Defendants. Unable to deny that the text was sent, Defendants attempted to explain it away, suggesting that the "40 min" text was sent accidentally and that Chang had meant to communicate to someone else at Vista (not Stahl) about a different transaction (Apptio). The trial court found no support for that in the record. Both Saroya and Chang "had zero recollection" of what they discussed on the phone that day. Unfortunately, there is little other contemporaneous evidence on the issue.

The record on this issue is limited to Stahl's text with Saroya. The text is clear. The text references a "40 min," which was Stollmeyer's minimum. The text prior to the "40 min" was about Mindbody. The text after the "40 min" was about Mindbody. And Vista called Chang in between to discuss Mindbody. All indicators were that the communication was not about Apptio at all. It was about Mindbody.

28

### F. Stollmeyer Tips Vista About The Formal Sale Process

The Guidelines required management to obtain authorization "for outbound communications to potential strategic parties," but Stollmeyer ignored them. On November 10, he texted Saroya asking to speak. They talked by phone later that day.

During his deposition, Stollmeyer testified that he informed Saroya during this call that Mindbody would be running a sales process: "Q. So it's your testimony today that on November 10th you notified Mr. Saroya of the process? A. Yes, I believe so." Stollmeyer repeated that admission later in his deposition. When asked, "So it's fair to say that as of November the 10th, your testimony is that you told Mr. Saroya, hey, we're going to be doing a process. Right?" Stollmeyer replied: "I believe I did."

Stollmeyer's tip was yet another bad fact for Defendants. At trial, Stollmeyer tried to recant. When confronted with his deposition testimony, he stated that he had "done a lot of thinking about it," that he had been deposed for "12 to 14 hours" by the time he was asked this line of questioning and, "[a]t that point" he was "confused about dates." He continued: "I'm not sure that I ever told Monti we're having a process." The deposition testimony at issue, however, occurred during the morning of the second day of his deposition, not at the end of a long day. Stollmeyer could have corrected his testimony by errata sheet, but he did not do so. For the trial court, circumstantial evidence made it likely that Stollmeyer did exactly what he described in his deposition. The court found that Plaintiffs had proved that Stollmeyer tipped Vista to the sales process on November 10.

There was at least one other instance in which Stollmeyer violated the Guidelines by contacting Vista. On November 17, Saroya texted Stollmeyer about an invitation to a

29

charity event in Miami. Stollmeyer replied, despite the prohibition in the Guidelines on outbound communications to potential acquirers, saying that it would be "worth the trip" and asking if he could bring his wife. Stollmeyer then asked Chang if he should attend, and Chang said no. That was the right answer, but Chang did not give that advice because the Guidelines plainly barred the contact. Rather, Chang texted Stollmeyer, "The more they think or feel you're in their camp, the less $ they'll pay." Stollmeyer was undaunted: "On the other hand, I [c]an show a little leg and get them frothing at the mouth to get me and MB in the portfolio[.]" For the trial court, although Stollmeyer eventually declined the invitation, the communications spoke volumes as to Stollmeyer's mindset at the time.

### G. *Mindbody Retains Qatalyst As Its Financial Advisor*

On November 14, 2018, the Transaction Committee convened to decide on hiring an investment banker. Vista conveyed its expression of interest on October 15. It was now one month later, and Mindbody still had not retained a financial advisor. Both Centerview and Qatalyst had provided advisory services to Mindbody in the past, and both were invited to pitch for the business.

Centerview's presentation emphasized its experience on deals in the technology sphere, where Mindbody operated. Centerview depicted Mindbody as a company facing near-term challenges but with excellent long-term prospects.

. . . .

Turning to the sale process, Centerview explained how its approach would achieve the goal of "Keeping MINDBODY's Special Committee in Control of the Process." According to Centerview's presentation, the process could take somewhere between 60–

30

190 days. Lytikainen's notes suggested that Centerview saw no need for a near-term transaction and that for purposes of a sale, the "time frame is two years." That comment reflected the view that Mindbody's prospects would improve as the Company worked through its near- term challenges.

Qatalyst's pitch emphasized its experience on deals with Vista. One of the slides showed potential transaction prices and highlighted $38.50 per share as corresponding to the revenue multiple Vista had paid in its Apptio acquisition. Qatalyst also described Vista's ability to "move very quickly through both business and confirmatory diligence" and "to truncate processes and reduce the ability for other potential acquirers to be able to complete diligence and provide certainty at the finish line[.]" Qatalyst envisioned a much quicker sale process and contemplated a closing as early as December 31 "if a party provides a pre-emptive bid that the Board finds compelling and other parties indicate lower ranges of value." That comment described Vista's preferred strategy.

After the presentations from Centerview and Qatalyst, the Transaction Committee authorized the Company to engage Qatalyst.

At trial, the directors lauded Qatalyst's experience with technology companies as the basis for their choice. The trial court found that testimony to be credible, but there was also evidence that Liaw—who knew of Stollmeyer's interactions with Vista—pushed to retain Qatalyst. The strongest proof of this fact was found in an email that Liaw sent to himself. When preparing to negotiate Qatalyst's fee, Liaw emailed himself a set of talking points that included "I lobbed this up for you guys to dunk it"; "You know I went to bat for you"; and "Everyone knows this a high probability outcome just based on the inbound

31

interest and overall set up[.]" At trial, Liaw tried to minimize the significance of these comments as containing "a degree of embellishment for the purpose of negotiating a lower fee for Mindbody," and that testimony was credible. Even discounting the statements for embellishment, the trial court found it to be undeniable that Liaw had advocated to retain the adviser who emphasized its relationship with Vista and recommended a quick sale process.

### H. Qatalyst Contacts Potential Buyers

With Qatalyst's help, Mindbody identified fourteen potential buyers, including both financial sponsors and strategic acquirors. Stollmeyer rejected one candidate because he didn't "want to work for a payments company."

Qatalyst planned to approach the strategic bidders beginning on November 19 and the financial sponsors beginning on November 30. Qatalyst wanted to contact the strategic bidders first because they often moved slower than the financial sponsors.

Under that schedule, Vista was not supposed to know that Mindbody had started a sale process until November 30 at the earliest. But Vista already knew and was ready to sprint. Vista had provided its expression of interest on October 15. Stollmeyer had tipped Vista about the process on November 10. There is even evidence that Vista gained additional insight into the schedule, because on November 27, Stahl texted a colleague that "Monti and I are going to be sprinting at Mindbody starting next week."

Chang formally contacted Vista on November 30. Chang did not contact the other financial sponsors until December 3 and 4. Interested buyers attended management presentations from Stollmeyer and his executive team. They met with H&F on the morning

32

of December 11. He texted his wife that the meeting "went really well. Like those guys." Later that day, the team met with Vista. Stollmeyer joined Sheth and Saroya for drinks afterward and texted Chang: "Am with Brian and Monti at Battery. Going great!" Stollmeyer treated the two firms differently.

### I. Vista's Investment Committee Approves A Range

On December 12, Saroya texted his team that Sheth wanted to convene Vista's Investment Committee on "Friday [December 14] and move fast on [Mindbody]." Vista received Bain's final market study on December 13, 2018, two days before other financial sponsors gained access to Mindbody's data room. Klomhaus testified that the Bain study gave Vista "more conviction that we knew more about the market than we otherwise would have." Another Vista deal team member later wrote, "[w]e were able to conduct all of our outside-in work before the process launched allowing us to gain conviction early that this is a must own business."

At trial, Defendants stressed that when the Investment Committee met, Vista still believed that it faced competition for Mindbody. The trial court found that to be true. Saroya messaged his team on December 13 instructing them to "[s]olve for approval up to 39. We are going to have a lot of competition on this one[.]" After learning that Vista's estimated internal rate of return at $39 per share would be the same as the Apptio transaction, Saroya instructed his team: "I think we show 35 but ask for approval up to 40." Vista wanted the ability to compete if it ended up facing competition, but Vista also hoped that by sprinting, it could eliminate the competition.

The drafting of the Investment Committee materials corroborated that Vista knew

in advance about the sale process. An early draft of the slide deck stated that Qatalyst had informed Vista of Mindbody's sale process in "[l]ate October 2018." That was true, and it revealed the informational advantage that Vista received. In the final presentation, the date was adjusted to November 30, which was the official date when Qatalyst was authorized to contact financial sponsors. In between drafts, Stahl sent a text to the drafter of the deck saying "dont tell them about process."

The deal team made similar changes to the summary memorandum distributed to the Investment Committee along with the presentation. An early draft contained a lengthy description of Vista's interactions with Stollmeyer:

> In August of 2018, Monti met with Rick and introduced him to Nicolas Stahl. The three of them had lunch in San Luis Obispo, where the Company is currently headquartered. *Rick mentioned that he would like to find a good home for his Company and expects to stay as the CEO for 2-3 more years*, citing two qualified internal candidates who would make good successors. In October at the CXO conference in San Diego, *Rick mentioned to Nicolas how impressed he has been with Robert and Vista's vision, reiterating his intention to explore a take-private for Mindbody.* Shortly after the conclusion of CXO, Rick reached out to Jeff Chang at Qatalyst Partners in order to begin preparatory work prior to kicking off a process for Mindbody after the Company's Q3 2018 Earnings Call on November 6th.

The final version omitted that paragraph and stated only that Saroya and Stahl met with Stollmeyer on August 23 and that Stollmeyer attended the CXO Summit. The final draft omitted Stollmeyer's other interactions with Vista and stated incorrectly that Vista first learned of a potential sale process on November 30.

On December 14, Vista's Investment Committee authorized a formal bid for Mindbody. No minutes or other record evidence reflects the discussion or the decision. Stahl testified that he did not recall what was said at the meeting. When asked at trial

34

whether the Investment Committee approved a range, Saroya testified that the Investment Committee approved a "cap of $35."

Saroya's testimony about a cap conflicted with his instructions to his team to prepare documents to obtain approval for a range of over $35 and "ask for approval *up to 40*." It is also inconsistent with a slide showing purchase prices at increasing revenue multiples up to $40/share.

Saroya's testimony conflicted with the testimony of Sheth, Vista's President. Sheth explained that the Investment Committee's practice was to provide a range, not a cap, and that they followed that practice for Mindbody. When presented with Sheth's testimony at trial, Saroya deferred to Sheth's recollection.

Saroya's testimony conflicted with how Vista acted. Vista started the bidding at $35 per share, which would be strange if that was a cap. Saroya testified that increasing a price beyond what the Investment Committee had authorized required an additional round of approval from the Investment Committee. Vista increased its bid, and Saroya had no recollection of getting an additional approval to go beyond the cap.

Saroya's testimony is inconsistent with his deal team's internal communications. Vista employees took bets on what price Vista would pay to acquire Mindbody. This came out in trial through a text from Stahl to Saroya, which attached a photo that Stahl called "[t]he line." The image had a line set at $37.50—halfway between $35 and $40. Vista employees submitted their over-under guesses of the eventual deal price. The lowest prediction was $36.50, and the highest prediction was $40. Over half of the participating employees guessed that the price would be greater than $37.50. The highest prediction by

35

a deal team member was $38.50/share. In response to this image, Saroya said, "37.5 is a good guess[.]" Stahl replied, "I thought so too."

In light of this evidence, the trial court deemed Saroya's testimony about a cap at $35 per share to be not credible. The Investment Committee approved a bidding range that went up to $40 per share.

### J.     *Mindbody Grants Data Room Access To Potential Acquirers*

Ultimately, seven parties signed non-disclosure agreements and gained access to Mindbody's data room. The data room opened on December 15. All parties received the same documents, which were designed to provide what a generic private equity fund would want to have for its "first-level diligence." Parties began dropping out after receiving data room access.

Vista moved forward. Stahl testified at trial that Vista's outlook on Mindbody's value initially soured after gaining access to the data room, because "there was less near-term growth than what we have previously anticipated." Stahl testified that Vista also had concerns about Mindbody's customer retention, its ability to upsell products to customers, declining organic revenue, and competitive threats. The contemporaneous evidence showed that like Mindbody management, Vista viewed those issues as near-term hurdles that the Company could overcome. After processing the information from the data room, Saroya texted Sheth that "our key finding is that if we fix the go to market engine we can accelerate growth meaningfully" and that "we will be lined up to preempt after you and I discuss." Saroya minimized the near-term challenges that the Company faced, stating, "[w]e see the same issues in most of these businesses."

Vista became more excited after meeting with Mindbody's sales team. Stahl texted Saroya that "the sale strategy was terrible and they have started fixing a lot of things." Stahl believed that Vista could achieve significant long-term gains after buying Mindbody.

### K. Vista Makes A Formal Offer

On December 18, 2018, three days after the data room opened, Vista submitted an offer to acquire the Company for $35 per share. Vista imposed a 24-hour deadline for acceptance. After that, the offer would expire. Vista conditioned its offer on Stollmeyer and IVP entering into a voting and support agreement.

That same day, Stahl sent Saroya the photo of the bidding line at $37.50, and Vista employees began betting on the final price. In his deposition, Stahl testified that the guesses were just a "game" that "wasn't based on anything." At trial, Saroya claimed to not recall what the "line" was even about. According to the trial court, Saroya's other texts give him away. Referring to a bet of $40 per share by an employee named Luke, he wrote, "Luke has no faith in me huh."

The Transaction Committee convened on December 19, 2018, to discuss Vista's offer of $35 per share. Later that day, the Transaction Committee directed Qatalyst to communicate to all potential bidders that there was pressing need for them to submit prompt indications of interest. The remaining potential bidders were much further behind in their diligence than Vista. One Qatalyst employee emailed Chang on December 19 to note that one bidder, Thoma Bravo, was not as far in their process: "They are just much further behind in their thinking. . . . Level of questions is much more basic so far."

Thoma Bravo dropped out of the process on December 20. Evidencing that Vista

continued to have privileged access to what was happening in the deal process, Vista had expected to learn after 3:00 p.m. Pacific Time that day whether Thoma Bravo had submitted a bid.

Another bidder, Recruit, was also still early in diligence. Recruit's impression from the management presentation was that Stollmeyer seemed "checked out." Stollmeyer told Centerview that he was uncomfortable with Recruit because he did not want to work with a Japanese company, as they required a translator.

By December 20, only Vista and one other bidder, H&F, remained. Qatalyst had initiated follow-up calls with H&F on Mindbody's go-to-market and financial performance, but H&F had not submitted an offer.

## L.    *Mindbody Counters And Vista Makes A "Best And Final Offer"*

Mindbody's Board convened on December 20 to discuss Vista's initial offer with Qatalyst. During the meeting, the Board authorized Qatalyst to make a counteroffer of $40 per share. Qatalyst had recommended that figure, which matched both the top of Vista's range and the number that Stollmeyer had said he wanted.

After receiving the counter, Saroya circulated a slide within Vista that identified potential synergies with other Vista portfolio companies. He wrote that "[o]ur team believes these synergies allow us to move up on our initial bid." At trial, Saroya claimed that the model presented to the Investment Committee only supported a maximum price between $36 and $37 per share and that he did not recall any discussion about a higher range. The evidence shows that the Investment Committee had already given Saroya authority to go above $35 per share.

On December 20, Vista bumped to $36.50 per share. Vista described its bid as its "best and final" offer, but the evidence shows that Vista could and would gone higher if it had been pressured to do so. Qatalyst first contacted Stollmeyer to communicate the offer. Stollmeyer then texted Liaw that Vista had given their "best and final" offer of $36.50. Liaw responded, "I'm kind of disappointed actually . . .."

Qatalyst reached out to H&F on December 21. H&F responded that they were "processing" and would need "2 more weeks to sign" up a transaction. On price, H&F told Qatalyst that they had "no path to $40."

At this point, the Transaction Committee seemed to discontinue meeting, and the full Board convened to discuss Vista's $36.50 per share bid on December 21. Without other bidders, the Board had to decide whether or not to take Vista's bid of $36.50. On December 21, Liaw told his partners that he "personally thought Vista would get up to $38," but that the market volatility and lack of other interested buyers made [$36.50] the most attractive offer. Goodman thought $36.50 per share was "an excellent price that would derisk the future for our shareholders." Smith thought that the premium "was definitely worth accepting versus the uncertainty of potentially several years of uncertain execution."

The deal price of $36.50 per share represented a premium of approximately 68% over the closing price of Mindbody's Class A common stock on December 21. Qatalyst said it could render a fairness opinion for the $36.50 per share offer. On December 21, the Board directed management to accept the bid and negotiate a merger agreement.

39

## M. The Parties Sign The Merger Agreement

On December 23, 2018, the Board approved the Agreement and Plan of Merger (the "Merger Agreement"), and the parties signed it. If the Merger closed, then each share of Mindbody common stock would be converted into the right to receive $36.50 per share in cash, subject to the stockholder's right to eschew the merger consideration and seek appraisal. Stollmeyer and IVP agreed to vote shares carrying 32.1% of Mindbody's outstanding voting power in favor of the Merger.

The Merger was publicly announced on December 24, 2018. Immediately after announcement, Stollmeyer texted his financial advisor: "Vista's in love with me (and me with them). No retirement in my headlights."

In an internal email, Vista's Mike McMullan described how Vista had secured the deal. He bragged that Vista was "able to conduct all of our outside-in work before the process launched," which enabled Vista "to move swiftly in the process to provide the MINDBODY Board with a highly certain offer within 3 days of receiving data room access."

## N. The Go-Shop

The Merger Agreement authorized a 30-day go-shop. Beginning on Christmas Eve, Qatalyst reached out to 52 potential bidders, 38 of which were entities that were not part of the sale process. Only eight received the management presentation and signed a non-disclosure agreement. Only two expressed interest in continuing diligence thereafter.

On January 5, 2019, Stollmeyer informed Vista that Luxor and another large stockholder were trying to put together a bid. Stollmeyer told Vista that it was a "low

likelihood" outcome because those parties "likely could only write $100-200mm checks." Stollmeyer conceded at trial that he should not have revealed this information to Vista. In any event, Luxor refused to sign an NDA, and Friedman admitted at trial that Luxor wanted to preserve the ability to vote against the merger and bring an appraisal claim in the future. No bid emerged.

On January 6, halfway through the go-shop process, Stollmeyer went on vacation to Costa Rica. He instructed management in an email to decline go-shop presentations in his absence, "[u]nless it's urgent." Stollmeyer was signaling his lack of interest in a competing offer.

## O.      The Proxy Materials

The Merger Agreement granted Vista rights and obligations related to the preliminary proxy, the definitive proxy, and any subsequent supplemental disclosures (all together, the "Proxy Materials"). The parties agreed that the Proxy Materials must not "contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not false or misleading." Section 6.3(b) gave Vista the right to "a reasonable opportunity to review and comment" on the Proxy Materials before they were filed. The Merger Agreement mandated that Mindbody "may not file the Proxy Statement or any Other Required Company Filing with the SEC without first providing [Vista] and its counsel a reasonable opportunity to review and comment thereon[.]" Section 6.3(d) obligated Vista to notify Mindbody if it became aware of any facts that, if not disclosed, would render the Proxy Materials materially misleading or

41

incomplete.

Saroya and Stahl both received a summary of Mindbody's proposed "Background of the Merger" section. Both the summary and the version filed with the SEC stated only that "[i]n October 2018, representatives of Vista and Mr. Stollmeyer discussed Vista's investment strategy and the firm's interest in learning more about MINDBODY's approach to the fitness, beauty and wellness services industries." The preliminary proxy omitted any references to Stollmeyer's meeting with Vista in August,[3] Stollmeyer's attendance at the CXO Summit in October, or Vista's expression of interest on October 15. Nevertheless, Stahl replied that the description "makes sense to me," and Saroya replied, "This works." Mindbody filed the preliminary proxy on January 9, 2019. Stahl texted Saroya on January 10 to remind him to stick to their story, which required saying that "Jeff [Chang] called you on 11/30 inviting us into the process[.]"

On January 11, Luxor filed a Schedule 13D stating that the proposed Merger Agreement "significantly undervalues" Mindbody. On January 14, Friedman spoke to Stollmeyer and asked him why Mindbody had guided down for Q4. Stollmeyer responded

---

[3] There was some confusion in the trial record and in the trial court's opinion as to when Stollmeyer first met with Vista. After Chang connected Stollmeyer with Saroya via email on August 7, there was only one initial in-person meeting between Stollmeyer, Saroya, and Stahl that occurred on September 4 at Mindbody's headquarters. Stollmeyer did not meet with anyone from Vista again until he attended Vista's CXO Summit on October 8 and 9. The trial court opinion sometimes refers to Stollmeyer's initial meeting with Vista as occurring "in August" – no such meeting ever occurred. It appears to us that these references are a misdated reference to the initial September 4 meeting. The confusion seems to stem from the original draft of an internal Vista memorandum that was circulated to Vista's Investment Committee that referred to the initial meeting as occurring "in August of 2018." This part of the memorandum is quoted in the trial court's opinion and the date is repeated again here. *Mindbody*, 2023 WL 2518149, at *24, *28 (Del. Ch. Mar. 15, 2023).

that he had "kitchen-sinked" the guidance. On January 18, 2019, Mindbody stockholder Luxor issued a demand for books and records under 8 *Del. C.* § 220 seeking, among other things, "the Company's actual or anticipated Q4 performance, including subscriber accounts by tier."

Stahl and Klomhaus also received a copy of Mindbody's proposed definitive proxy. Klomhaus did not have any comments or edits. Stahl noted that he had "had some discussions" with counsel about the documents and wanted to review the changes. At trial, Stahl testified that he did not believe there were any undisclosed aspects of the Merger that should have been disclosed. Like the preliminary proxy, the definitive proxy omitted any reference to Stollmeyer's meeting with Vista in August,[4] Stollmeyer's attendance at the CXO Summit in October, or Vista's expression of interest on October 16.

Stollmeyer reviewed and signed the definitive proxy as CEO. On January 23, 2019, Mindbody filed the definitive proxy with the SEC.

### P.    The "Massive Beat"

On January 4, 2019, Mindbody determined preliminarily that its Q4 revenue had come in around $68.3 million. Stollmeyer texted White that day, "$68.3M Q4. Awesome!" He advised his management team that this figure reflected 37% growth year over year and a "massive beat against the Street's $66 million consensus midpoint."

On January 6, Stollmeyer texted White again about the Q4 results: "One question: should we plan one last Earnings Call? My script: 'here's our big beat. Adios mutha

---

[4] *See supra* note 3.

f\*\*\*\*\*\*s.'"

On January 24, after Mindbody filed the definitive proxy, White emailed the Audit Committee to convey his belief that Mindbody should disclose the preliminary Q4 results. White noted that Q4 revenue "exceeded consensus pretty meaningfully" and that the information should be publicly released by February 7 "so the shareholders have the information before they vote" on February 14. Liaw agreed but expressed concern that Luxor "may use this information to bolster their position[.]" Smith also expressed concern about the effect of the disclosure on the Merger vote: "What happens (hypothetically) if the vote fails on Feb. 14th? Just want to understand that first." By asking about the effect on the vote, they demonstrated that they thought the information could be important for the vote.

By January 31, Mindbody's outside counsel had drafted a press release announcing the preliminary Q4 results. As required by the Merger Agreement, Mindbody sent the draft to Vista. After speaking with outside counsel, Klomhaus asked Stahl for "a minute to chat about my concerns."

The Audit Committee met on February 6. Mindbody's outside counsel reported on Vista's position. The Audit Committee voted against disclosing the Q4 results. Neither the discussions nor the purported determination appear in the minutes.

During this litigation, the Audit Committee members provided several reasons for their recommendation. Both Liaw and Smith testified that they were concerned with setting a precedent of pre-announcing quarterly results if the Merger failed. The fact that a merger vote was pending provided an obvious distinction from ordinary course situations.

44

There was also already information in the market on the subject, because Mindbody had issued the Proxy Materials that included Mindbody's 2019 projections. If the Merger failed, Mindbody would not be in the same position for future quarters.

Herman, Smith, and Cunningham all testified at trial that the amount of the revenue beat was not material. The trial court found that testimony is hard to square with Stollmeyer and White's contemporaneous reactions, and that it was inconsistent with Company counsel's preparation of a press release that would announce the results. This was another issue on which Stollmeyer changed his testimony at trial. He had acknowledged in his deposition that this information would be material to an investor, but he maintained at trial that the information would not be material to a stockholder voting on the Merger. Liaw, White, and Smith also testified that releasing the Q4 results, without context, would be misleading to investors.

. . . .

## Q. *Litigation Ensues*

Before the Merger closed, Mindbody stockholders filed federal securities class actions in California and Delaware. In the Court of Chancery, Mindbody stockholders Philip Ryan, Jr. and Donald Friedman filed suit under 8 *Del. C.* § 225 challenging the validity of the stockholder vote (the "Section 225 Action"). The next day, Luxor filed an enforcement action in the Court of Chancery under 8 *Del. C.* § 220 to obtain books and records concerning the Merger (the "Section 220 Action").

To moot the federal suits and aspects of the Section 225 Action, Mindbody issued supplemental disclosures (the "Supplemental Disclosures"). As with the previous SEC

45

filings related to the Merger, Vista had the opportunity to review the Supplemental Disclosures before filing. Multiple Vista personnel, including Saroya and Stahl, received a copy before filing. Vista's outside counsel said they were "scrubbing one more time." On February 7, Mindbody issued the Supplemental Disclosures, which added details about the sale process and other issues.

ISS and Glass Lewis recommended that stockholders vote for the transaction. Analysts also supported the Merger. The stockholders approved the Merger during a special meeting on February 14, 2019. The Merger closed the next day.

## R.    Vista Hires Stollmeyer

On February 17, two days after the Merger closed, Stollmeyer retained employment counsel and began negotiating with Vista over the terms of his post-acquisition employment. Unlike the formal sale process, those negotiations took months.

The terms of Stollmeyer's post-deal employment resembled his pre-deal employment. Stollmeyer took the same salary and bonus in 2019. He received a stock grant equal to 1.7% of the post-transaction equity, assuming full vesting and no forfeiture.

## S.    This Litigation Takes The Main Stage

After the Merger closed, the litigation landscape shifted. Mindbody produced documents in response to the Section 220 action, which Luxor voluntarily dismissed in August 2019.

The Section 225 Action moved forward, with discovery concluding in April 2019. That same month, Luxor filed an appraisal petition (the "Appraisal Action"). In June 2019, Luxor filed a class action lawsuit alleging breach of fiduciary duty claims against

46

Stollmeyer, White, and Liaw (the "Luxor Action").

In October 2019, the court consolidated the Section 225 Action, the Appraisal Action, and the Luxor Action into this proceeding. The court named Luxor as the lead plaintiff for purposes of the claims raised in the Luxor Action but permitted the plaintiffs who had filed the Section 225 Action to continue pursuing the Section 225 claim.

The Section 225 claim moved forward rapidly, and the court held a trial on a paper record on December 9, 2019. After trial, the parties then agreed to a settlement of the Section 225 claim, which the court approved on December 15, 2020.

Luxor amended its complaint to strengthen its claims for breach of fiduciary duty, and the defendants moved to dismiss. The court issued a decision that dismissed the claims against Liaw and otherwise denied the motion. The decision noted that Liaw's dismissal was without prejudice.

. . . .

After fact discovery closed, Luxor sought leave to amend its complaint. After receiving leave, Luxor filed the operative complaint on July 27, 2021. It dropped White as a defendant, reasserted claims against Liaw, and added aiding and abetting claims against IVP and Vista. Liaw, IVP, and Vista moved for dismissal. Stollmeyer moved for summary judgment. The court denied all three motions. Liaw and IVP agreed to a settlement, which the court approved. That left only Stollmeyer and Vista as defendants.

The court held trial February 28, 2022, through March 9, 2022. Post-trial briefing concluded on July 14, 2022, and post-trial argument was heard on July 28, 2022. The parties submitted their joint schedule of evidence on August 11, 2022.

47

### III.    THE TRIAL COURT'S RULINGS

With that unchallenged set of detailed fact-findings carefully crafted by the Chancellor, we proceed to our discussion and analysis.  The trial court issued its post-trial opinion on March 15, 2023 (the "March Opinion").  The Chancellor found that:  (i) Stollmeyer breached his fiduciary duties under *Revlon* by "tilt[ing] the sale process in Vista's favor for personal reasons[;]"[5] (ii) Stollmeyer breached his duty of disclosure by "fail[ing] to disclose the full extent of his involvement with Vista, which was a material omission[;]"[6] and (iii) Vista aided and abetted Stollmeyer's breach of his duty of disclosure by "failing to correct the proxy materials to include a full and fair description of its own interactions with Stollmeyer."[7]  Accordingly, the trial court awarded damages equal to "$1 per share in damages, plus interest and costs consistent with this opinion."[8]

Before entering final judgment, the trial court issued another opinion on November 15, 2023 (the "November Opinion").[9]  The November Opinion responded to the parties' numerous disputes over the form of the March Opinion's final order and judgment.  In the only ruling relevant to this appeal, the trial court held that Stollmeyer and Vista (the "Non-Settling Defendants") had waived their right to seek a settlement credit by not raising the

---

[5] *Mindbody*, 2023 WL 2518149, at *2.

[6] *Id.* at *3.

[7] *Id.*

[8] *Id.* at *48.

[9] *In re Mindbody, Inc. S'holder Litig.*, 2023 WL 7704774 (Del. Ch. Nov. 15, 2023) [hereinafter "November Opinion"].

48

issue pre-trial.[10]

> A. *The Trial Court Ruled That Stollmeyer Breached His Fiduciary Duty of Loyalty under Revlon*

The trial court found that Plaintiffs proved a paradigmatic *Revlon* claim where a conflicted fiduciary who is insufficiently checked by the board tilted the sale process toward his own personal interest in ways inconsistent with maximizing shareholder value. The trial court found that Stollmeyer suffered a disabling conflict because he had an interest in near-term liquidity, a desire to sell fast, and an expectation that he would receive post-merger employment accompanied by significant equity-based incentives as a Vista CXO. He tilted the sale process by strategically driving down Mindbody's stock price and providing Vista with informational and timing advantages during the due-diligence and go-shop periods. The Board also failed to adequately oversee Stollmeyer because he did not fully inform them.

Although Defendants argued that the *Corwin* defense should apply, the trial court held that Mindbody's proxy disclosure deficiencies defeated *Corwin* cleansing because the stockholder vote was not fully informed. Thus, the trial court held that the disclosure violations defeated the *Corwin* defense to Stollmeyer's breach of fiduciary duty. The trial court rejected Plaintiffs' claim that Vista aided and abetted Stollmeyer's *Revlon* breach because Plaintiffs failed to timely assert that claim before or during trial.

---

[10] *Id.* at *6.

B.    *The Trial Court Ruled that Stollmeyer Breached His Fiduciary Duty of Disclosure*

The trial court found that Plaintiffs prevailed against both Stollmeyer and Vista on the disclosure claim. The trial court found that even after Mindbody issued Supplemental Disclosures, Mindbody's Proxy Materials contained partial and complete omissions about the sale process that rendered the Proxy Materials materially misleading. The trial court held that Stollmeyer's failure to disclose his full involvement with Vista in Mindbody's proxy statements was a material omission in violation of his duty of disclosure.

C.    *The Trial Court Ruled that Vista Aided and Abetted Stollmeyer's Breach of His Duty of Disclosure*

According to the trial court, Vista aided and abetted Stollmeyer's disclosure breach by failing to correct the Proxy Materials to include a full and fair description of its own interactions with Stollmeyer. In reaching this conclusion, the trial court relied on Vista's contractual obligation to review the Proxy Materials and notify Mindbody if there were any material omissions. The trial court found that Vista personnel reviewed the Proxy Materials, knew about Vista's interactions that were omitted and the significance of those omissions, and failed to speak up.

D.    *The Trial Court Awarded Damages for the Revlon Breach*

Plaintiffs sought the lost transaction price that Vista would have paid if the process had not been tilted in its favor. Plaintiffs argued that the price was $40 per share. The trial court accepted Plaintiffs' theory of liability but rejected the $40 per share figure as lacking a sufficient evidentiary basis. Instead, the trial court found that the record supported that Vista would have paid $37.50 per share. Accordingly, the trial court held Stollmeyer liable

50

for $1 per share.

E.       *The Trial Court Awarded Damages for the Disclosure Breach*

The trial court awarded nominal damages of $1 per share for the disclosure breach in the Proxy Materials — which totaled over $35 million (not counting appraisal petitioners and prejudgment interest). In calculating this award, the court first held that Plaintiffs were only entitled to nominal damages because they made "no effort" to prove "reliance and causation."[11]

The court relied primarily on *Weinberger v. UOP, Inc.*[12] in formulating its nominal damages award. The trial court noted that, on remand, the Chancellor in *Weinberger* was tasked with awarding damages for a breach of fiduciary duty stemming from a failure to disclose certain material information.[13] The *Weinberger* court awarded damages of "$1 per share on a deal price of $21 per share, reflecting damages equal to 4.8% of the deal price."[14] This $1 per share remedy was calculated "by relying upon evidence that, at the time of the merger, a per-share price of $22 rather than the $21 per share actual price would have

---

[11] *Mindbody*, 2023 WL 2518149, at *46 (quoting *Dohmen v. Goodman*, 234 A.3d 1161, 1175 (Del. 2020)).

[12] 1985 WL 11546 (Del. Ch. Jan. 30, 1985), *aff'd*, 497 A.2d 792 (Del. July 9, 1985) (TABLE).

[13] *Mindbody*, 2023 WL 2518149, at *46.

[14] *Id. See also Weinberger*, 1985 WL 11546, at *9 ("The approval of the minority secured in the face of the inadequate proxy information enabled [acquirer] to get what it wanted at the price it wanted to pay, and it seems without question that achieving sole ownership of [target] has proven quite profitable to [acquirer]. Under these circumstances, I feel that the minority should be compensated for the wrong done to them even though a damage figure cannot be ascertained from a comparison of selected stock values and hypotheticals with any degree of precision. Quite simply, equity will not suffer a wrong without a remedy.").

51

represented a beneficial deal for the acquirer."[15]  With this framework in mind, the trial court in this case derived a $1 per share calculation.[16]

Because the trial court held that Vista aided and abetted Stollmeyer's disclosure breach, the trial court held Stollmeyer and Vista jointly and severally liable for the $1 per share disclosure breach damages.  Stollmeyer was also liable for $1 per share in *Revlon* breach damages, but the trial court held that Plaintiffs were entitled to only one recovery of $1 per share.

F.  *The Trial Court Held that Defendants Waived Their Settlement Credit Argument*

In its November Opinion, the Court of Chancery held that the Non-Settling Defendants had waived their right to seek a settlement credit under the Delaware Uniform Contribution Among Tortfeasors Act ("DUCATA").[17]  The trial court reasoned that although Defendants' failure to prove joint tortfeasor status at trial did not automatically bar them from seeking DUCATA settlement credit post-trial, Defendants had waived their right to seek a settlement credit because they did not preserve the issue in any way before trial.  Instead, they did not raise the issue until the last footnote on the last page of their last post-trial brief.  The trial court concluded that Defendants' failure to timely raise the issue meant that Plaintiffs were not on notice of the need to defend against these arguments,

---

[15] *Mindbody*, 2023 WL 2518149, at *47 (internal citation omitted).  *See also Weinberger*, 1985 WL 11546, at *10 (adding that the acquirer's own expert stated that $22 per share "would not have been out of line for the acquisition of the 49.5% minority interest" of the target and that a price "within the range of $20–$22 would have been fair to the [target] minority.").

[16] *Mindbody*, 2023 WL 2518149, at *47.

[17] *November Opinion*, 2023 WL 7704774, at *3.  *See* 10 *Del. C.* §§ 6301–08.

which their trial strategy reflected, and that allowing Defendants to raise the issue post-trial would be unfair to Plaintiffs.

## IV.    CONTENTIONS ON APPEAL

First, Appellants contend that the trial court erred in ruling that Stollmeyer breached his fiduciary duty of loyalty under *Revlon* and his duty of disclosure. Second, Appellants argue that the trial court erred in ruling that Vista aided and abetted Stollmeyer's disclosure breaches. Third, Appellants argue that the court erred in awarding any damages because there were no damages from either the sale-process breach or the disclosure breach, and that the court erred when it awarded tens of millions of dollars in "nominal" damages. Finally, Appellants contend that the trial court erred in holding that Defendants waived their statutory right to seek a settlement credit based on Plaintiffs' settlement with the settling defendants, thereby giving Plaintiffs a pure windfall.

## V.    ANALYSIS

### A.    *Stollmeyer's Revlon Breach Is Supported by the Record*

The trial court's holding that Stollmeyer breached his fiduciary duty of loyalty is based on the Chancellor's detailed set of fact-findings set forth above. Appellants challenge none of the fact-findings — only the conclusions drawn from the facts. After reviewing the possible standards of review, the trial court applied the standard of review urged by Stollmeyer — *Revlon* — and found that his conduct fell outside the range of

53

reasonableness.[18]  Further, it found that *Corwin* cleansing was not available because he failed to disclose material information, which rendered the stockholder vote uninformed.

"Our review of a trial court's application of enhanced scrutiny to board action necessarily implicates a review of law and fact."[19]  We review the Court of Chancery's conclusions of law *de novo*[20] and its factual findings for *clear error*.[21]  We agree with the trial court's analysis and affirm its holding that Stollmeyer breached his duty of loyalty under *Revlon*.

### 1.  The Revlon Standard of Review

When a stockholder challenges a change-of-control transaction, such as the all-cash merger at issue in this case, enhanced scrutiny under *Revlon* is the presumptive standard of review.[22]  *Revlon* did not create a new fiduciary duty or change the nature of existing fiduciary duties.  Rather, in the sale of control context, directors and officers must exercise their fiduciary duties to maximize the company's value for the stockholders' benefit.[23]

---

[18] *Mindbody*, 2023 WL 2518149, at *33.

[19] *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 849 (Del. 2015) (citing *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1385 (Del. 1995)).

[20] *Unitrin*, 651 A.2d at 1385; *RBC*, 129 A.3d at 849.

[21] *RBC*, 129 A.3d at 849 (citing *DV Realty Advisors LLC v. Policemen's Annuity and Ben. Fund of Chicago*, 75 A.3d 101, 108–09 (Del. 2013)).

[22] *See Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 182 (Del. 1986).

[23] *See Revlon*, 506 A.2d at 182 (explaining that once a sale of the company became inevitable, the duty of the board "changed from the preservation of Revlon as a corporate entity to the maximization of the company's value at a sale for the stockholders' benefit"); *RBC*, 129 A.3d at 849 (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1083–84 (Del. 2001)) ("[E]nhanced scrutiny under *Revlon* does not change the nature of the fiduciary duties owed by directors:  *Revlon* neither creates a new type of fiduciary duty in the sale-of-control context nor alters the nature of the fiduciary duties that generally apply.  Rather, *Revlon* emphasizes that the board must perform its fiduciary duties in the service of a specific objective:  maximizing the sale price of the

There is no particular path that fiduciaries must follow to maximize value, so long as the chosen path is reasonable.[24] The key elements of *Revlon* enhanced scrutiny require both (i) reasonableness of the decision-making process employed by the directors, including the information on which the directors based their decision, and (ii) reasonableness of the directors' action in light of the circumstances then existing.[25]

The "paradigmatic" *Revlon* claim involves a conflicted fiduciary who is insufficiently checked by the board and who tilts the sale process toward his own personal interests in ways inconsistent with maximizing stockholder value.[26] The trial court found

---

enterprise."); *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 44 (Del. 1994) ("In the sale of control context, the directors must focus on one primary objective—to secure the transaction offering the best value reasonably available for the stockholders—and they must exercise their fiduciary duties to further that end.").

[24] *See C & J Energy Srvcs., Inc. v. City of Miami Gen. Emps.*, 107 A.3d 1049, 1067 (Del. 2014) ("As this Court has made clear, 'there is no single blueprint that a board must follow to fulfill its duties,' and a court applying *Revlon*'s enhanced scrutiny must decide 'whether the directors made a *reasonable* decision, not a *perfect* decision.'") (internal citations omitted) (emphasis in original); *see also Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 45 (Del. 1994) ("[A] court applying enhanced judicial scrutiny should be deciding whether the directors made **a reasonable** decision, not **a perfect** decision. If a board selected one of several reasonable alternatives, a court should not second-guess that choice even though it might have decided otherwise or subsequent events may have cast doubt on the board's determination. Thus, courts will not substitute their business judgment for that of the directors, but will determine if the directors' decision was, on balance, within a range of reasonableness.") (emphasis in original).

[25] *See Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 45 (Del. 1994) (describing the key features of enhanced scrutiny as: "(a) a judicial determination regarding the adequacy of the decisionmaking process employed by the directors, including the information on which the directors based their decision; and (b) a judicial examination of the reasonableness of the directors' action in light of the circumstances then existing.").

[26] *See In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1002 (Del. Ch. 2005) ("[T]he paradigmatic context for a good *Revlon* claim . . . is when a supine board under the sway of an overweening CEO bent on a certain direction, tilts the sales process for reasons inimical to the stockholders' desire for the best price.") (quoted favorably in *Kahn v. Stern*, 183 A.3d 715, 2018 WL 1341719, at *1 n.4 (Del. Mar. 15, 2018) (TABLE); *Mindbody*, 2023 WL 2518149, at *34 (quoting the same).

that when a plaintiff proves a paradigmatic *Revlon* claim, that showing "calls into question the reasonableness of the decision-making process employed and the reasonableness of the directors' action in light of the circumstances then existing" required under enhanced scrutiny.[27] We agree.

### 2. The Record Evidence Supports the Finding of Breach

We next highlight some of the trial court's key factual determinations regarding Stollmeyer's disabling conflicts, his tilting of the sale process to favor Vista, and the state of the board's knowledge throughout the process. We conclude that the Chancellor's detailed findings adequately support the conclusion that Stollmeyer breached his *Revlon* duties.

First, the trial court examined Stollmeyer's "subjective intent" and found that he suffered disabling conflicts. Specifically, the trial court found that Stollmeyer was subjectively motivated in large part by his need for liquidity, based on the fact that by 2018, Stollmeyer had never experienced a big liquidity event, had made several million dollars' worth of unpaid financial commitments, spent money in a way that required him to dig into his line of credit to fund additional financial commitments, and described his pre-Merger financial position as "living at or near the precipice of financial ruin."[28]

The trial court also found that Stollmeyer became "uniquely smitten" with Vista before the start of the formal sale process. After meeting with Vista twice, and particularly

---

[27] *Mindbody*, 2023 WL 2518149, at *34.

[28] *Id.* at *35.

56

after the CXO Summit where he saw presentations about the wealth of Vista portfolio company CEOs that he called "very impressive" and "mind blowing/inspiring," Stollmeyer described himself as loving Vista. Stollmeyer also gave Vista that impression, and Vista "tout[ed] internally that Stollmeyer 'loved' them" and that they had forged a strong relationship with him.[29] Part of Stollmeyer's favoritism of Vista was his expectation that if Mindbody were sold to Vista, he could keep his position as CEO, reload with equity, and "make as much money over the next three years as he did the first go around" after a second sale of the company.

Another component of Stollmeyer's disabling conflicts was his time crunch and his "desire to sell fast."[30] The trial court found that Plaintiffs proved Stollmeyer needed liquidity, was tired of running a public company, and "had a relatively limited window for effectuating a transaction."[31] He knew that it would be easier to sell while Liaw remained on the board and before Luxor, who opposed a sale of Mindbody, joined the board. He also knew that it was advantageous to sell before the looming sunset of the super-voting shares. Chang had warned Stollmeyer that Vista liked to move fast, and the trial court found that for Stollmeyer, Vista's speed was a plus. The trial court found that contrary to Defendants' argument, Stollmeyer's stock ownership did not result in his interests being aligned with other stockholders and that the record "overwhelmingly" supported Plaintiffs' theory of Stollmeyer's disabling conflicts. We agree.

---

[29] *Id.* at *36.

[30] *Id.* at *34.

[31] *Id.* at *36.

Second, the trial court made detailed findings that Stollmeyer tilted the sale process in Vista's favor. Although Stollmeyer did not have Board authorization to explore a sale of Mindbody until mid-October 2018, the trial court found that Stollmeyer met with Vista twice prior to authorization and signaled in both meetings that Mindbody could be an acquisition target. In response, Vista began drafting a memorandum for its Investment Committee and preparing its expression of interest. At least by October 11, when Chang warned Stollmeyer that Vista liked to move fast, Stollmeyer knew that Vista might attempt to move fast to gain a competitive advantage. Instead of slowing Vista down to ensure a competitive process, Stollmeyer helped Vista get ahead. By waiting eight days after Vista's expression of interest on October 15 to inform all the board members of that interest, Stollmeyer delayed the formal start of the sale process and gave Vista a head start.

Vista used that head start to accelerate its process. Based on Stollmeyer's signal that Mindbody would be sold and his obvious "love" for Vista, Saroya retained Bain & Co. in mid-October to conduct an expensive outside-in market analysis of Mindbody that would take four to six weeks to complete. Beginning the process so early positioned Vista to make a firm offer in early December.

The trial court found that this skewed sale process had an "obvious effect."[32] No other bidder heard about the process until November 19, and no other financial bidders were contacted until December 3 or 4. When Vista was ready to make a firm offer in early December, other potential bidders were still in early stages. By the time Vista made its

---

[32] *Id*. at *38

58

best and final offer on December 20, H & F was Vista's only competitor, and H & F "lamented internally that they needed more time."[33] The trial court also found that no other bidder received such informational advantages before the start of the formal sale process, Stollmeyer did not communicate with any other bidders in breach of the Transaction Committee's Guidelines, none of the others knew the specific financial range to target, and none could say "[w]e were able to conduct all of our outside-in work *before the process launched*" like Vista.[34] Based on these factual findings, the trial court concluded that without competitive pressure, Mindbody had no leverage to extract a higher price, and that without Stollmeyer's help, Vista would not have acquired Mindbody for $36.50 per share. Stollmeyer tilted the sale process to favor Vista.

Third, the trial court made detailed findings about what the Board did not know. The trial court observed that directors can manage conflicts if they are aware of them but found that the Mindbody Board did not know about the conflicts that infected the sale process.[35] Specifically, the trial court found that the Board did not know about Stollmeyer's need for liquidity, IVP's desire for a near-term exit of their Mindbody investment, the details of Stollmeyer's September 4 meeting with Vista, Stollmeyer's impression of the CXO Summit as "mind blowing/inspiring," Stollmeyer's communicated desire to find a "good home" for his company, Stollmeyer's "love" for Vista, Chang's tip

---

[33] *Id.*

[34] *Id.* (emphasis in original).

[35] *Id.* ("Directors can manage conflicts if they are aware of them. The Mindbody Board did not know about the conflicts that infected the sale process. Not surprisingly, the Board did not manage them effectively.").

59

to Vista about Stollmeyer's $40 minimum share price, Stollmeyer's November 10 tip to Vista about the start of the formal sale process, or Vista's "huge head start."[36]  The trial court concluded that the Board was "in the dark" and that Stollmeyer deprived the Board of the information it needed to employ the kind of reasonable decision-making process required under *Revlon* enhanced scrutiny.[37]

### 3.   The Corwin Defense Does Not Apply

Appellants argue on appeal that *Corwin* cleansing should apply.  When enhanced scrutiny under *Revlon* is the standard of review, a defendant can restore the business judgment rule through *Corwin* cleansing for a transaction without a controlling stockholder by showing that the transaction was "approved by a fully informed, uncoerced majority of the disinterested stockholders."[38]  The trial court noted that generally when a plaintiff proves a paradigmatic *Revlon* claim, "a defendant will not be able to show that the stockholder vote was fully informed, precisely because the Board did not know about and

---

[36] *Id.* at *38–39.

[37] *Id.* at *39 ("In short, the Board was in the dark.  Stollmeyer's actions deprived the Board of the information needed to employ a reasonable decision-making process.  Given the Board's lack of knowledge, Stollmeyer cannot rely on the Board's actions to support the reasonableness of the sale process or the ultimate outcome.").

[38] *Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304, 305–06 (Del. 2015) (affirming the Court of Chancery's holdings that the plaintiff did not plead facts supporting an inference that the defendant was a controlling stockholder and that "the business judgment rule is invoked as the appropriate standard of review for a post-closing damages action when a merger that is not subject to the entire fairness standard of review has been approved by a fully informed, uncoerced majority of the disinterested stockholders.").

60

could not disclose the information about the officer's machinations."[39]  That generalization proves true in this case because the stockholders were not made aware of Stollmeyer's disabling conflicts or the way the sale process favored Vista.  The trial court concluded that these omissions defeat the *Corwin* defense.[40]

The trial court's findings support its ultimate conclusion that Plaintiffs proved a paradigmatic *Revlon* claim and that *Corwin* cleansing was not available to Stollmeyer.  In sum, Stollmeyer was a conflicted fiduciary who tilted the sale process toward Vista for personal reasons and was not adequately overseen by the Board.  As a result, Stollmeyer's actions were not reasonable under the circumstances and the Board was not able to conduct a reasonable decision-making process.  Because Stollmeyer kept material information from the Board, the Board could not fully inform the stockholders before the vote and *Corwin* cleansing does not apply.  We affirm the ruling of the trial court that Stollmeyer breached his duty of loyalty under *Revlon*.

B.      *Stollmeyer's Disclosure Breach Is Supported by the Record*

The trial court's holding that Stollmeyer breached his fiduciary duty of disclosure is based on the Chancellor's fact-findings set forth above.  The trial court's analysis focused on assessing the materiality of "partial and complete omissions" in the Mindbody Proxy Materials that remained undisclosed after Mindbody issued its Supplemental Disclosures

---

[39] *Mindbody*, 2023 WL 2518149, at *39 (citing *In re Xura, Inc. S'holder Litig.*, 2018 WL 6498677, at *12–13 (Del. Ch. Dec. 10, 2018); *In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 114–15 (Del. Ch. 2007)).

[40] *Mindbody*, 2023 WL 2518149, at *39.

on February 7.[41]  The trial court identified three partial and four complete omissions before analyzing the materiality of the omissions taken as a whole.  Appellants challenge none of the Chancellor's fact-findings and argue that these omissions are not material.  We agree with the trial court that there were material omissions, and therefore we affirm the trial court's ruling that Stollmeyer breached his duty of disclosure.  Our reversal of the aiding and abetting determination means that we need not address the challenges directed to the disclosure damages award.

"Whether disclosures are adequate 'is a mixed [question] of law and fact, requiring an assessment of the inferences a reasonable shareholder would draw and the significance of those inferences to the individual shareholder.'"[42]  We have the "authority to review the entire record and to make [our] own findings of fact in a proper case."[43]  However, if the trial judge's findings "are sufficiently supported by the record and are the product of an orderly and logical deductive process," then "we accept them, even though independently we might have reached opposite conclusions."[44]

### 1.  The Duty of Disclosure

Directors and officers owe a fiduciary duty of disclosure to the corporation and its stockholders.  The duty of disclosure "is not an independent dut[y] but the application in a

---

[41] *Id.* at *40–41.

[42] *RBC*, 129 A.3d at 857–58 (quoting *Shell Petroleum, Inc. v. Smith*, 606 A.2d 112, 114 (Del. 1992).

[43] *Shell Petroleum*, 606 A.2d at 114 (quoting *Levitt v. Bouvier*, 287 A.2d 671, 673 (Del. 1972).

[44] *Id.* (quoting *Levitt*, 287 A.2d at 673).

specific context of the board's fiduciary duties of care, good faith, and loyalty."[45]  When

directors and officers seek stockholder action, such as stockholder approval for a merger,

they have a fiduciary duty to "disclose fully and fairly all material information within

[their] control."[46]  This means that "corporate fiduciaries can breach their duty of disclosure

under Delaware law . . . by making a materially false statement, by omitting a material fact,

or by making a partial disclosure that is materially misleading."[47]  Omitted information is

material if there is "a substantial likelihood that the disclosure of the omitted fact would

have been viewed by the reasonable investor as having significantly altered the 'total mix'

of information available."[48]

The duty of disclosure also extends to partial omissions because "disclosures cannot

be materially misleading either."[49]  "[O]nce defendants [have] traveled down the road of

partial disclosure of the history leading up to the Merger . . . they ha[ve] an obligation to

provide the stockholders with an accurate, full, and fair characterization of those historic

---

[45] *RBC*, 129 A.3d at 858 (quoting *Malpiede*, 780 A.2d at 1086).

[46] *In re GGP, Inc. S'holder Litig.*, 282 A.3d 37, 62 (Del. 2022) (quoting *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992); *see also Appel v. Berkman*, 180 A.3d 1055, 1057 (Del. 2018) ("Precisely because Delaware law gives important effect to an informed stockholder decision, Delaware law also requires that the disclosures the board makes to stockholders contain the material facts and not describe events in a materially misleading way."); *Pfeffer v. Redstone*, 965 A.2d 676, 686 (Del. 2009) ("Directors must fully and fairly disclose all material information within [their] control when seeking shareholder action.).

[47] *RBC*, 129 A.3d at 858 (quoting *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009)).

[48] *Morrison v. Berry*, 191 A.3d 268, 283 (Del. 2018) (quoting *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985); *see also TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

[49] *In re Tesla Motors, Inc. S'holder Litig.*, 298 A.3d 667, 713 (Del. 2023) (quoting *Morrison*, 191 A.3d at 283) (internal quotations omitted).

events."[50]  "[E]ven a non-material fact can, in some instances, trigger an obligation to disclose additional, otherwise non-material facts in order to prevent the initial disclosure from materially misleading the stockholders."[51]

### 2. The Partial Omissions

The trial court first assessed three alleged partial omissions.  The trial court found that although the Supplemental Disclosures disclosed Stollmeyer's meetings with Vista on September 4 and at Vista's CXO Summit on October 8 and 9, the disclosures omitted certain details that "paint[ed] his interactions with Vista in a sterile light."[52]  The Supplemental Disclosures described the September 4 meeting in the following way:

> [A] representative of Vista emailed [Mr.] Stollmeyer, offering to meet for lunch, which took place on September 4, 2018, and at which Mr. Stollmeyer provided the representative of Vista with a general overview of MINDBODY and its approach to the fitness[,] beauty and wellness services industries as was typical for Mr. Stollmeyer to present to potential investors.[53]

The trial court found that this description omitted that Stollmeyer "invited discussions about an acquisition" by stating that he wanted to find a "good home" for his company, that he was "getting tired," and that he expected to "stay in his seat 2–3 more years."[54]

---

[50] *Morrison*, 191 A.3d at 283 (quoting *Arnold v. Soc'y For Sav. Bancorp, Inc.*, 650 A.2d 1270, 1280 (Del. 1994)).

[51] *Id.* (quoting *Zirn v. VLI Corp.*, 681 A.2d 1050, 1056 (Del. 1996)).

[52] *Mindbody*, 2023 WL 2518149, at *40.

[53] *Id.* (quoting Supplemental Disclosures); *see also* App. to Opening Br. at 1846 (Supplemental Disclosures at 4).

[54] *Id.*

Next, the Supplemental Disclosures described Stollmeyer's attendance at Vista's CXO Summit as follows:

> In October 2018, at that "meet and greet" annual conference hosted by Vista, at which Mr. Stollmeyer was present as an attendee on October 8th and 9th, representatives of Vista and Mr. Stollmeyer discussed Vista's investment strategy and the firm's interest in learning more about MINDBODY's approach to the fitness, beauty and wellness services industries.[55]

The trial court found that this description of the CXO Summit as a "run-of-the-mill industry gathering" omitted the fact that Stollmeyer "reiterated his intention to explore a sale of Mindbody, without any Board authorization to do so."[56]

Finally, the Supplemental Disclosures disclosed Vista's October 15 expression of interest, but the trial court found the disclosure to be "anodyne" because it stated only that "Vista indicated to Mr. Stollmeyer that it was interested in pursuing strategic transaction discussions with MINDBODY."[57] According to the trial court, this description omitted the details that Stollmeyer spoke with Saroya for 25 minutes and "Saroya shared that Vista saw Mindbody's stock price correction as a buying opportunity, was willing to pay a 'substantial premium' to Mindbody's then-trading stock price of $33.27 per share, and did not see any need for an 'automatic exit' for management."[58]

---

[55] *Id.* (quoting Supplemental Disclosures); *see also* App. to Opening Br. at 1846 (Supplemental Disclosures at 4).

[56] *Id.* at *40–41.

[57] *Id.* at *41.

[58] *Id.*

### 3. The Complete Omissions

The trial court then listed four "complete omissions" that were not disclosed in the Proxy Materials at all. The four complete omissions were: Stollmeyer's reference call with a Vista portfolio CEO on October 19, Chang's tip to Vista on November 6 that Stollmeyer wanted $40 per share, Stollmeyer's tip to Vista on November 10 that Mindbody would be running a sale process, and Saroya's invitation for Stollmeyer to attend a charity event in Miami followed by "Stollmeyer's initial acceptance as long as he could bring his wife."[59]

The trial court found that the Proxy Materials, taken as a whole, "create a false narrative in which Stollmeyer met casually with Vista on September 4 and October 9, Vista expressed general interest in a transaction on October 15, and then Vista learned of the formal sale process with other potential acquirers on November 30."[60] The trial court then concluded that this was not an "'accurate, full and fair characterization' of those events."[61] We agree.

The strongest record support for Stollmeyer's breach of his disclosure duty is the omission of the two tips to Vista. The first was the omission of Chang's tip to Vista on November 6 that Stollmeyer wanted $40 per share.[62] The second was the omission of

---

[59] *Id.*

[60] *Id.*

[61] *Id.* (quoting *Arnold*, 650 A.2d at 1280).

[62] As to Chang's tip to Saroya that Stollmeyer wanted $40 per share, the trial court made a general finding in its aiding and abetting analysis that "[o]ther than Stollmeyer (and on some issues, Chang), Vista was the *only* party who knew this information." *Id.* at *43. Chang's tip was included in the list of things that comprised "this information." *Id.* Accordingly, as to Chang's tip, we think

Stollmeyer's tip to Saroya on November 10, when he called Saroya in violation of the Transaction Committee's Guidelines to tell him that Mindbody would be running a sale process. These tips occurred approximately three weeks before Vista was formally invited into the process by Qatalyst on November 30. If Vista had not already begun its acquisition process, the November 10 tip would have given Vista virtual certainty that Mindbody was coming to market and a three-week head start over any other bidder. The November 6 tip gave Vista an informational advantage about how to structure its pricing models and what price range would likely be acceptable. We believe any reasonable stockholder would find these tips to one potential acquirer and not any others indicative of a potentially flawed sale process that would significantly alter the total mix of information and would be important in considering whether to vote to approve the merger. Accordingly, the tips were material. We affirm the trial court's holding that Stollmeyer breached his duty of disclosure.

C.      *Whether Vista Aided and Abetted Stollmeyer's Breaches*

We turn next to whether the trial court erred in holding that Vista aided and abetted Stollmeyer's disclosure breaches. The trial court's holding that Vista aided and abetted Stollmeyer's disclosure breaches was based on both findings of fact and conclusions of law. This Court reviews the trial court's factual findings for *clear error*.[63] We review the trial court's conclusions of law *de novo*.[64]

---

this general finding is best read as a finding that Stollmeyer did know about Chang's tip to Vista on November 6.

[63] *See RBC*, 129 A.3d at 861 (citing *DV Realty Advisors*, 75 A.3d at 109).

[64] *See Unitrin*, 651 A.2d at 1385; *RBC*, 129 A.3d at 861.

The trial court held that Vista's "contractual obligation" in the merger agreement to review Mindbody's proxy statements and "correct" any misstatements or omissions, and Vista's subsequent failure to correct omissions, amounted to "knowing participation" in Stollmeyer's breach of his duty of disclosure. Analyzing whether the trial court erred in this holding raises a number of novel issues for this Court, including the issue of when third-party buyers can be held liable for aiding and abetting fiduciary breaches, whether contractual undertakings in merger agreements can create fiduciary duties for third parties to the target's stockholders, and whether a passive failure to act rather than active participation or "substantial assistance" can give rise to liability. The case law is thin and the briefing by the parties was scant on all of these novel issues.

### 1. The Elements of an Aiding and Abetting Claim and Our Holding

The basic four-part test for proving an aiding and abetting claim is well-settled under Delaware law and was articulated by this Court in *Malpiede*. The test requires "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, . . . (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach."[65] As the trial court noted, the existence of a fiduciary relationship (between Stollmeyer and Mindbody's stockholders) was never in dispute. The second element, the breach of the fiduciary's duty, was established above when we affirmed the trial court's ruling that Stollmeyer breached his duty of disclosure. The trial court's analysis focused on the third element, the defendant's (Vista's) "knowing participation." The trial court

---

[65] *Malpiede*, 780 A.2d at 1096 (internal citations omitted).

68

divided the "knowing participation" prong of the aiding and abetting test into two parts, knowledge (or *scienter*) and participation. The trial court analyzed Vista's knowledge first and recounted factual findings that supported its conclusion that Vista acted with *scienter*.

The trial court held that Vista also "participated" in Stollmeyer's disclosure breaches. The linchpin of the trial court's analysis was that Vista was contractually obligated to review Mindbody's proxy statements and to "correct" any misstatements or omissions, which Vista failed to do. The trial court reasoned that "Vista participated in the drafting of the Proxy Materials. . . . Vista had an obligation to correct the material omissions discussed above and failed to do so. Vista thus withheld information from the stockholders. Vista is liable for aiding and abetting in Stollmeyer's process-based disclosure breaches."[66] As a result, the trial court held that Stollmeyer and Vista were jointly and severally liable for the disclosure breaches and awarded damages of $1 per share.[67]

Appellants argue that no claim for aiding and abetting is available based solely on a buyer's failure to correct the seller's Proxy Materials to its stockholders. Specifically, they argue that such a failure constitutes only a passive awareness of Stollmeyer's breach of disclosure and that third parties have no duty, imposed by law or equity, to "ensure that all material facts are disclosed, by fiduciaries to their principals."[68] They point out that plaintiffs did not assert any such breach of contract claim.[69] We hold that the Merger

---

[66] *Mindbody*, 2023 WL 2518149, at *44.

[67] *Id.* at *47.

[68] Opening Br. at 46 (quoting *Buttonwood Tree Value P'rs, L.P. v. R. L. Polk & Co.*, 2017 WL 3172722, at *10 (Del. Ch. July 24, 2017)).

[69] *Id.* at 47.

Agreement's contractual provision did not transform Vista's inaction into a "knowing participation" in Stollmeyer's disclosure breach. Based upon the record before us, the "participation" requirement has not been established. Further, aspects of the *scienter* requirement, namely, Vista's knowledge of the wrongfulness of its own conduct regarding the disclosure breach, also fall short on this record. Accordingly, the "knowing participation" element of the aiding and abetting test is not satisfied, and we reverse the trial court's holding that Vista aided and abetted Stollmeyer's disclosure breach.

### 2. Overview of "Knowing Participation"

Like the trial court, we focus our analysis on the "knowing participation" inquiry. This element is often the most difficult to prove and involves two distinct concepts that are sometimes analyzed separately: knowledge and participation. We turn first to the knowledge prong of "knowing participation" and analyze what our case law requires for a plaintiff to establish *scienter*. We then review the case law on what constitutes participation in this aiding and abetting context. We also consider guidance offered by the Restatement (Second) of Torts "substantial assistance" multi-factor test as a helpful analytical framework that addresses both aspects of "knowing participation" in a wholistic fashion. We then apply the case law and Restatement factors to assess whether the trial court erred in determining that Vista knowingly participated in Stollmeyer's breach of his disclosure duty.

### a. The Law of Scienter

We turn first to the knowledge part of the "knowing participation" analysis. To prove *scienter* for an aiding and abetting claim, a plaintiff must prove two types of

knowledge.  As this Court first held in *Malpiede*, "[k]nowing participation in a board's fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach."[70]  Since *Malpiede*, this rule requiring that an aider and abettor know that the *primary party's* conduct constitutes a breach has been restated in many cases.[71]  Knowledge that the primary party has breached its fiduciary duty is not enough, however.  This Court clarified in *RBC* that to prove *scienter* in an aiding and abetting claim, a plaintiff must also demonstrate that the aider and abettor had actual knowledge "that their conduct was legally improper."[72]  This rule has also been restated in many cases since *RBC*.[73]  This requirement that the aider and abettor must know that *its own* conduct regarding the breach was legally improper is distinct from knowledge that the primary party's conduct was a breach.  In other words, "[i]t is the aider and abettor that must act with *scienter*."[74]  "[T]he question of whether a defendant acted with *scienter* is a

---

[70] *Malpiede*, 780 A.2d at 1097.

[71] *See, e.g.*, *RBC*, 129 A.3d at 861–62; *Gatz v. Ponsoldt*, 925 A.2d 1265, 1276 (Del. 2007); *Chester County Emps. Retirement Fund v. KCG Holdings, Inc.*, 2019 WL 2564093, at *18 (Del. Ch. June 21, 2019); *Mesirov v. Enbridge Energy Co.*, 2018 WL 4182204, at *13 (Del. Ch. Aug. 29, 2018).

[72] *RBC*, 129 A.3d at 862 (quoting *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008) (internal quotation marks omitted)).

[73] *See, e.g.*, *Firefighters' Pension Sys. of Kansas City, Mo. Trust v. Presidio, Inc.*, 251 A.3d 212, 275 (Del. Ch. Jan. 29, 2021); *New Enter. Assocs. 14, L.P. v. Rich*, 292 A.3d 112, 175 (Del. Ch. Mar. 9, 2023).

[74] *RBC*, 129 A.3d at 862.  In *RBC*, this requirement that the aider and abettor, RBC, act with *scienter* was satisfied when RBC "knowingly induced the breach by exploiting its own conflicted interests to the detriment of Rural and by creating an informational vacuum."  *Id.*

factual determination."[75] As we said in *RBC*, "the requirement that the aider and abettor act with *scienter* makes an aiding and abetting claim among the most difficult to prove."[76]

### b. The Law of What Constitutes "Participation"

Participation can also involve a nuanced analysis. In an M&A case, the role of the alleged aider and abettor in the transaction is important and can raise the level of difficulty of proving this already difficult claim to prove. When an aiding and abetting claim is brought against a potential acquirer negotiating at arms'-length, participation should be the most difficult to prove.[77] This is because Delaware law protects arms'-length negotiations and "a bidder's attempts to reduce the sale price through arm's-length negotiations cannot give rise to liability for aiding and abetting."[78] A buyer may be liable to a target's stockholders if the buyer "attempts to create or exploit conflicts of interest in the board" or

---

[75] *Id.*

[76] *RBC*, 129 A.3d at 865–66; *see also Singh v. Attenborough*, 137 A.3d 151, 153 (Del. 2016) ("In fact, most professionals face liability under a standard involving mere negligence, not the second highest state of scienter—knowledge—in the model penal code.").

[77] *See, e.g., Morgan v. Cash*, 2010 WL 2803746, at *8 (Del. Ch. July 16, 2010) ("[T]he long-standing rule that arm's-length bargaining is privileged and does not, absent actual collusion and facilitation of fiduciary wrongdoing, constitute aiding and abetting helps to safeguard the market for corporate control by facilitating the bargaining that is central to the American model of capitalism."); *In re Gen. Motors (Hughes) S'holder Litig.*, 2005 WL 1089021, at *26 (Del. Ch. May 4, 2005) ("This Court has consistently held that 'evidence of arm's-length negotiation with fiduciaries negated a claim of aiding and abetting, because such evidence precludes a showing that the defendants knowingly participated in the breach by the fiduciaries.'") (quoting *In re Frederick's of Hollywood, Inc. S'holders Litig.*, 1998 WL 398244, at *3 n.8 (Del. Ch. July 9, 1998)).

[78] *Malpiede*, 780 A.2d at 1097. *See also In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 837 (Del. Ch. 2011) ("A third-party bidder who negotiates at arms' length rarely faces a viable claim for aiding and abetting."); *In re Frederick's of Hollywood, Inc. S'holders Litig.*, 1998 WL 398244, at *4 (Del. Ch. July 9, 1998) ("[A]n offeror who conducts arm's-length negotiations leading to an acquisition agreement cannot be said to be knowingly participating in an alleged breach of fiduciary duty by the target board.").

"where the bidder and the board conspire in or agree to the fiduciary breach," however.[79] The participation requirement "protects acquirors, and by extension their investors, from the high costs of discovery where there is no reasonable factual basis supporting an inference that the acquiror was involved in any nefarious activity."[80] The participation requirement also benefits target stockholders "by ensuring that potential acquirors are not deterred from making bids by the potential for suffering litigation costs and risks on top of the considerable risk that already accompanies buying another entity[.]"[81]

Settling on the proper analytical framework for assessing participation is essential. In this case, that is an especially difficult task given the novelty of the issues and the fact that the novel issues that we must analyze were not presented by the parties in any depth in the proceedings below.

Delaware trial courts have held that participation in an aiding and abetting claim requires that the aider and abettor provide "substantial assistance" to the primary violator.[82]

---

[79] *Malpiede*, 780 A.2d at 1097–98 (citing *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1058 (Del. Ch. 1984) ("[A]lthough an offeror may attempt to obtain the lowest possible price for stock through arm's-length negotiations with the target's board, it may not knowingly participate in the target board's breach of fiduciary duty by extracting terms which require the opposite party to prefer its interests at the expense of its shareholders.")); *see also In re Hechinger Inv. Co. of Del., Inc.*, 278 F. App'x 125, 130–31 (3d Cir. 2008) (citing *Malpiede* and observing that "[w]hen a party, such as LGP, is merely negotiating a deal at arm's length—and not trying to create, exploit, or otherwise profit from fiduciaries' conflicts—it by definition is not knowingly participating in anything but a normal business transaction.").

[80] *Morgan v. Cash*, 2010 WL 2803746, at *8 (Del. Ch. July 16, 2010).

[81] *Id.*

[82] *See, e.g.*, *In re Dole Food Co. S'holder Litig.*, 2015 WL 5052214, at *41 (Del. Ch. Aug. 27, 2015) ("Because the involvement of secondary actors in tortious conduct can take a variety of forms that can differ vastly in their magnitude, effect, and consequential culpability, the element of 'knowing participation' requires that the secondary actor have provided 'substantial assistance' to the primary violator.") (quoting *Kuhns v. Bruce A. Hiler Del. QPRT*, 2014 WL 1292860, at *21

This substantial assistance can take many forms. Some courts have accepted the idea that a failure to act might constitute substantial assistance.[83] However, in the corporate context, these instances appear to be limited primarily to the federal securities law arena.[84] The parties here have cited no such case in the corporate governance context. Rather, our case law in the corporate governance context has found liability only where there has been overt participation such as active "attempts to create or exploit conflicts of interest in the board" or an overt conspiracy or agreement between the buyer and the board as described above.[85]

This substantial assistance requirement can also be understood as requiring active participation rather than "passive awareness."[86] As the Court of Chancery explained in *Buttonwood*, "passive awareness on the part of [the defendant] does not constitute

---

(Del. Ch. Mar. 31, 2014)); *Patton v. Simone*, 1992 WL 183064, at *8, *12 (Del. Super. June 25, 1992) (quoting Restatement (Second) of Torts § 876(b) for the "substantial assistance" requirement and analyzing whether the defendant provided substantial assistance by loaning money to the primary violator); *see also* Restatement (Second) of Torts § 876(b) (1979) (making a secondary actor liable "[f]or harm resulting to a third party from the tortious conduct of another" if the secondary actor "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself").

[83] *See* Sarah L. Swan, *Aiding and Abetting Matters*, 12 J. TORT L. 255, 271 (2019) (explaining that "some courts *have* recognized that knowledge and a failure to act can, in some circumstances, rise to the level of providing substantial assistance") (internal citations omitted).

[84] The cases that have found such liability are generally in the federal securities violation sphere and suggest that where inaction forms the basis of the claim, only "scienter of the high 'conscious intent' variety" should meet the scienter requirement. *See, e.g.*, Nathan Isaac Combs, *Civil Aiding and Abetting Liability*, 58 VAND. L. REV. 241, 271–73 (2005) (collecting authorities and quoting *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 97 (5th Cir. 1975)).

[85] *Malpiede*, 780 A.2d at 1097.

[86] *Buttonwood*, 2017 WL 3172722, at *10. Scholars have noted that there can be a distinction between "inaction which does nothing to assist and inaction which serves as substantial assistance," such as a lookout for a criminal conspiracy, but that analogy does not seem to apply to these facts. Sarah L. Swan, *Aiding and Abetting Matters*, 12 J. TORT L. 255, 272 (2019).

'substantial assistance' to any breach resulting from [the primary violator's] failure to disclose the facts."[87] In *RBC*, we affirmed aiding and abetting liability for a financial advisor who "purposely misled the [seller's] Board so as to proximately cause the Board to breach its duty of care."[88] In *Buttonwood*, however, the Court of Chancery held that a financial advisor was not liable for "passive awareness . . . of the omission of material facts in disclosures to the stockholders, made by fiduciaries *who themselves were aware of the information*."[89]

The parties cite no Delaware case finding liability against a third-party bidder for aiding and abetting a breach of fiduciary duty. Rather, as the Court of Chancery noted in *Xura* after the plaintiff "unsurprisingly" cited no case law in support of their argument, "an

---

[87] *Id.* ("The Plaintiffs allege only a passive awareness on the part of a non-fiduciary of the omission of material facts in disclosures to the stockholders, made by fiduciaries *who themselves were aware of the information*. Such passive awareness on the part of SRR does not constitute 'substantial assistance' to any breach resulting from the Individual Defendants' failure to disclose the facts.") (emphasis in original).

[88] *RBC*, 129 A.3d at 865. In *RBC*, the requirement that the aider and abettor, RBC, act with *scienter* was satisfied when RBC "knowingly induced the breach by exploiting its own conflicted interests to the detriment of Rural and by creating an informational vacuum." *Id.* at 862. The analytical focus was on RBC's knowledge of the wrongfulness of *its own* conduct, not the conduct of the board of directors that RBC duped. *Id.* at 865–66 ("[T]he claim for aiding and abetting was premised on RBC's 'fraud on the Board,' and that RBC aided and abetted the Board's breach of duty where, for RBC's own motives, it 'intentionally duped' the directors into breaching their duty of care. The record evidence amply supports the trial court's conclusion that RBC purposely misled the Board so as to proximately cause the Board to breach its duty of care. Accordingly, our holding is a narrow one that should not be read expansively to suggest that any failure on the part of a financial advisor to *prevent* directors from breaching their duty of care gives rise to a claim for aiding and abetting a breach of the duty of care.") (emphasis in original). *See also Singh*, 137 A.3d at 152–53 ("As held in *RBC Capital Markets, LLC v. Jervis*, however, an advisor whose bad-faith actions cause its board clients to breach their situational fiduciary duties (e.g. the duties *Revlon* imposes in a change-of-control transaction) is liable for aiding and abetting.").

[89] *Buttonwood*, 2017 WL 3172722, at *10 (emphasis in original).

75

aiding and abetting claim based on a third-party's alleged failure somehow to *prevent* a board from providing misleading disclosures to stockholders rests on thin ice."[90] The court implied an active participation requirement, explaining that the plaintiff pled no facts that would support an inference that the defendant "knowingly *facilitated* alleged disclosure deficiencies or otherwise 'knowingly participated' in that aspect of the alleged breach of fiduciary [duty]."[91]

The requirement of substantial assistance for a finding of "knowing participation" emanates from the Restatement (Second) of Torts § 876(b). Many Delaware cases have cited § 876(b) as persuasive authority for what the "knowing participation" element requires.[92] Section 876 reads in its entirety:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
>
> > (a) does a tortious act in concert with the other or pursuant to a common design with him, or

---

[90] *In re Xura, Inc. S'holder Litig.*, 2018 WL 6498677, at *15, *15 n.148 (Del. Ch. Dec. 10, 2018).

[91] *Id.* (emphasis in original).

[92] *See, e.g., Dole*, 2015 WL 5052214, at *41; *Patton*, 1992 WL 183064, at *8; *Lake Treasure Holdings, Ltd. V. Foundry Hill GP LLC*, 2014 WL 5192179, at *11 (Del. Ch. Oct. 10, 2014); *FrontFour Cap. Group LLC v. Taube*, 2019 WL 1313408, at *31 (Del. Ch. Mar. 11, 2019). Courts from other jurisdictions have cited to § 876(b) as well. *See, e.g., Landy v. Fed. Deposit. Ins. Co.*, 486 F.2d 139, 162 (3d Cir. 1973), *cert. denied*, 416 U.S. 960 (1974); *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983); *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 185 (Minn. 1999); *Future Group, II v. Nationsbank*, 478 S.E.2d 45, 50 (S.C. 1996); *Bondi v. Citigroup, Inc.*, 2005 WL 975856, at *17 (N.J. Super. Ct. Law Div. Feb. 28, 2005); *see also* Jorge Freeland, B. Edwin W. Merrick & Lawrence M. Scheinert, *Aiding and Abetting Branches of Fiduciary Duties May Lead to Purchaser Liability*, 14 No. 6 M & A Law. 7, 1 (June 2010) (observing that "[m]any states have adopted this section of the Restatement and explicitly recognize a cause of action for aiding and abetting a breach of fiduciary duty," and that "[t]hough the language describing the elements may vary, the analysis in each jurisdiction is essentially the same.").

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.[93]

The first instance of a Delaware court requiring "substantial assistance" to the primary violator in an aiding and abetting tort claim occurred in the Superior Court decision *Patton v. Simone*.[94]  In *Patton*, the Superior Court relied on multiple United States Court of Appeals cases citing the Restatement (Second) of Torts § 876 and a West Virginia Supreme Court case to support its holding that there must be knowledge "linked to the substantial assistance" of an aider and abettor, and that without a third party's independent duty to a plaintiff, there can be no liability for a failure to act.[95]  More recently, in 2014, the Court of Chancery quoted the "substantial assistance" requirement when describing the elements of an aiding and abetting claim in two cases, *Lake Treasure Holdings, Ltd. v. Foundry Hill GP LLC*[96] and *Kuhns v. Bruce A. Hiler Delaware QPRT*.[97]

---

[93] Restatement (Second) of Torts § 876 (1979).

[94] 1992 WL 183064 (Del. Super. June 25, 1992).

[95] *Patton*, 1992 WL 183064, at *9–11 (citing among others *FDIC v. First Interstate Bank of Des Moines*, 885 F.2d 423, 431 (8th Cir. 1989); *Friedman v. F.E. Myers Co.*, 706 F. Supp. 376 (E.D. Pa. 1989); *Price v. Halstead*, 355 S.E.2d 380 (W.Va. 1987)).

[96] *Lake Treasure*, 2014 WL 5192179, at *11 (quoting the Restatement (Second) of Torts § 876 when discussing the "knowing participation" element of an aiding and abetting breach of fiduciary duty claim).

[97] *Kuhns*, 2014 WL 1292860, at *21 (quoting *Anderson v. Airco, Inc.*, 2004 WL 2827887, at *4 (Del. Super. Nov. 30, 2004)) ("Liability for aiding and abetting a third party's commission of a tort requires proof of three elements: underlying tortious conduct, knowledge, and substantial assistance.") (internal brackets omitted).

Reliance on § 876(b) solidified in 2015, when the Court of Chancery conducted a thorough analysis of the requirements for "knowing participation" in the context of a claim for aiding and abetting a breach of fiduciary duty in *In re Dole Food Co., Inc. Stockholder Litigation*.[98] The court stated that because secondary actors can be involved in tortious conduct in a variety of ways "that can differ vastly in their magnitude, effect, and consequential culpability," knowing participation "requires that the secondary actor have provided 'substantial assistance' to the primary violator."[99] Since *Dole*, many Delaware cases have cited *Dole* and § 876(b)'s substantial assistance requirement, including the trial court in this case.[100]

The court in *Dole* then quoted the "substantial assistance" requirement from the Restatement (Second) of Torts § 876(b) and listed "illustrative factors" drawn from *Kuhns* and *Patton* for analyzing whether a secondary actor "knowingly provided substantial assistance."[101] The "illustrative factors" from *Dole* ultimately derive from the Restatement (Second) of Torts § 876, comment d, which sets forth five factors to consider when

[98] *Dole*, 2015 WL 5052214, at *41–42.

[99] *Id.* at *41 (quoting *Kuhns*, 2014 WL 1292860, at *21.

[100] *Mindbody*, 2023 WL 2518149, at *44. At least twelve cases since *Dole* involving a claim for aiding and abetting a breach of fiduciary duty have cited *Dole* for the "substantial assistance" requirement of "knowing participation." *See, e.g.*, *Buttonwood*, 2017 WL 3172722, at *9; *In re Oracle Corp. Derivative Litig.*, 2020 WL 3410745, at *11 (Del. Ch. June 22, 2020); *BrandRep, LLC v. Ruskey*, 2019 WL 117768, at *5 (Del. Ch. Jan. 7, 2019); *Lockton v. Rogers*, 2022 WL 604011, at *16 (Del. Ch. Mar. 1, 2022).

[101] *Dole*, 2015 WL 5052214, at *41–42 (citing *Kuhns*, 2014 WL 1292860, at *21; *Patton*, 1992 WL 183064, at *12).

analyzing whether the defendant's assistance or participation is substantial enough for liability:

> The assistance of or participation by the defendant may be so slight that he is not liable for the act of the other. In determining this, [1] the nature of the act encouraged, [2] the amount of assistance given by the defendant, [3] his presence or absence at the time of the tort, [4] his relation to the other[,] and [5] his state of mind are all considered.[102]

The relevance of each factor depends on the facts of the case, and not all factors are relevant in all situations.[103] The factors have been phrased and expanded upon differently by different courts. The Restatement factors analyzed in *Dole* are the following:

- The nature of the tortious act that the secondary actor participated in or encouraged, including its severity, the clarity of the violation, the extent of the consequences, and the secondary actor's knowledge of these aspects;

- The amount, kind, and duration of assistance given, including how directly involved the secondary actor was in the primary actor's conduct;

- The nature of the relationship between the secondary and primary actors; and

- The secondary actor's state of mind.[104]

Some Delaware trial courts have used the Restatement substantial assistance factors as an analytical framework to assess an aiding and abetting claim.[105] We also find these

---

[102] Restatement (Second) of Torts § 876, cmt. d (1979).

[103] *See Fassett v. Delta Kappa Epsilon*, 807 F.2d 1150, 1163 (3d Cir. 1986), *cert. denied*, 481 U.S. 1070 (1987) (listing six factors drawn from the Restatement (Second) of Torts § 876, cmt. d and observing that "all six of these factors are not necessarily relevant in all types of situations").

[104] *Dole*, 2015 WL 5052214, at *42.

[105] *See id.*; *Oracle*, 2020 WL 3410745, at *11; *Patton*, 1992 WL 183064, at *12; *Kuhns*, 2014 WL 1292860, at *21; *see also Landy*, 486 F.2d at 163. *Dole* and *Oracle* applied the Restatement substantial assistance factors in a corporate context, while *Patton* and *Kuhns* applied the factors in other tort contexts.

Restatement factors to be a helpful analytical framework for assessing substantial assistance, knowledge, and participation. Accordingly, we structure our analysis around them.

### 3. Applying the Restatement Test and Whether Vista's Conduct Constituted "Substantial Assistance"

Next, we apply the case law and Restatement factors to assess whether the trial court erred in determining that Vista knowingly participated in Stollmeyer's breach of his disclosure duty. Ultimately, we conclude that the "knowing participation" element of the aiding and abetting test is not satisfied.

### a. The Severity and Clarity of the Violation, and Vista's Knowledge of These Aspects

In assessing the severity and clarity of Stollmeyer's disclosure breach and Vista's knowledge of the severity and clarity of that violation, it is helpful to analyze the trial court's factual findings to assess the weight and materiality of the various omissions that formed the basis of Stollmeyer's disclosure breach. This analysis goes to the first knowledge requirement for a finding of *scienter* under the "knowing participation" element of an aiding and abetting claim: whether Vista acted "with the knowledge that the conduct advocated or assisted constitutes such a breach."[106]

The details that were left out of the "partial omissions" the trial court found included Stollmeyer's September 4 statement that he was looking for a "good home" for his company and was "tired" of running a public company, Stollmeyer's statement of intention

---

[106] *Malpiede*, 780 A.2d at 1097; *see supra* Section V.C.2.a (discussing the law of *scienter* and the two types of knowledge required for a finding of *scienter*).

to explore a take-private merger at the CXO Summit, and Vista's October 15 expression of interest to Stollmeyer in a 25 minute phone call that contemplated a price with a significant premium over market value and retention of some members of management.

The four complete omissions the trial court found included Stollmeyer's reference call to one of Vista's portfolio company CEOs, Chang's November 6 tip about Stollmeyer's minimum price of $40 per share, Stollmeyer's November 10 tip about the timing of the sale process, and Saroya's November 17 invitation for Stollmeyer to attend a charity event in Miami along with Stollmeyer's "initial acceptance as long as he could bring his wife."

The four complete omissions are not of equal weight. We take them each in turn. Saroya's invitation for Stollmeyer to attend a charity event in Miami is less weighty in terms of materiality, for example. The trial court found Stollmeyer's response to be an "initial acceptance as long as he could bring his wife."[107] The text messages indicate that after Saroya invited Stollmeyer to the event, Stollmeyer responded: "Hi Monti – having a good weekend. Thank you for the invite. This sounds like an amazing cause and worth the trip. Will see if I can juggle a few things, and get back to you soon. Are spouses appropriate?"[108] The extent of this interaction between Stollmeyer and Saroya is that Saroya invited Stollmeyer to an event, Stollmeyer asked a question about the event, and then Stollmeyer ultimately declined to attend.[109] This omission appears to us to be of less

---

[107] *Mindbody*, 2023 WL 2518149, at *41.

[108] App. to Answering Br. at B540.

[109] The trial court also noted that Stollmeyer asked Chang whether Stollmeyer should attend the event. After Chang said no, Stollmeyer texted Chang, "I [c]an show a little leg and get them frothing at the mouth to get me and MB in the portfolio." *Mindbody*, 2023 WL 2518149, at *21. Although relevant to Stollmeyer's state of mind, this was not a communication between Stollmeyer

"magnitude and effect" compared with the others and, thus, we could understand that Vista could see it as being of questionable materiality.

The remaining three omissions are more clearly material. Stollmeyer's reference call with a Vista portfolio CEO on October 19 could have indirectly indicated Stollmeyer's growing preference for Vista or given Vista reason to be more confident that Mindbody would come to market. Accordingly, a reasonable stockholder could find that the reference call significantly alters the total mix of information.

As we noted above, the clearest instances of Stollmeyer breaching his disclosure duty are the omissions of Chang's tip to Vista on November 6 and Stollmeyer's tip to Saroya on November 10. Chang's tip to Vista on November 6 that Stollmeyer wanted $40 per share gave Vista an information advantage over other bidders and allowed Vista to configure its pricing model to get to a potential $40 per share price for Mindbody. Stollmeyer tipped Saroya on November 10 when he called Saroya in violation of the Transaction Committee's Guidelines to tell him that Mindbody would be running a sale process. These tips occurred approximately three weeks before Qatalyst formally invited Vista into the process by on November 30. Stollmeyer's tip gave Vista a three-week head start over other potential bidders. As we held above in the disclosure breach analysis, any reasonable stockholder would find these tips to one potential acquirer and not any others indicative of a potentially flawed sale process that would significantly alter the total mix of information available to the stockholders in deciding how to vote. The omissions of

---

and Saroya, and these details would have greater weight if Stollmeyer had ultimately accepted the invitation.

82

Chang's November 6 tip and Stollmeyer's November 10 tip to Vista were undoubtedly material.

Accordingly, these omissions adequately support the trial court's holding that Stollmeyer breached his disclosure duty, as we affirmed above. The nature of the disclosure violation and its materiality to the target stockholders should be considered in assessing the "severity and clarity of the violation" from Vista's perspective. Although the disclosure violations may not be of equal weight, the record, particularly as to the November 6 and November 10 tips, supports the conclusion that Vista likely knew that the conduct of the primary violator, Stollmeyer, constituted a breach. This knowledge satisfies the first type of required knowledge for a finding of *scienter*. This Restatement factor weighs in favor of holding that Vista gave "substantial assistance" to Stollmeyer in his breach. This is only one part of the *scienter* analysis, however, as we have only addressed the state of the record regarding Vista's knowledge of Stollmeyer's conduct constituting a breach in this section. We address the state of the record as to Vista's knowledge of the wrongfulness of its own conduct later in our analysis.

> b. *The Amount, Kind, and Duration of Assistance Given, Including Whether There Was Direct Involvement*

The next factor we analyze is the amount, kind, and duration of assistance that Vista gave to Stollmeyer, including whether Vista was directly involved in Stollmeyer's breach. Here, Vista provided no affirmative assistance at all and took no action that actively furthered Stollmeyer's disclosure breach. Instead, Plaintiffs' argument is premised on Vista's failure to act.

The trial court held that the plaintiffs "proved that Vista participated in the breach."[110] The trial court based this ruling on its finding that the Merger Agreement contained language that, in the trial court's words, created a "contractual obligation for Vista to correct any material omissions in the Proxy Materials."[111] The trial court characterizes the provision this way based on two sections of the Merger Agreement. The first is § 6.3(b), which states that:

> [Mindbody] may not file the Proxy Statement or any Other Required Company Filing with the SEC without first providing [Vista] and its counsel a reasonable opportunity to review and comment thereon, and [Mindbody] will give due consideration to all reasonable additions, deletions or changes suggested thereto by [Vista] or its counsel.[112]

The second is § 6.3(d) of the Merger Agreement, which states that:

> Each of [Mindbody], on the one hand, and [Vista], on the other hand, will furnish all information concerning it and its Affiliates, if applicable, as the other Party may reasonably request in connection with the preparation and filing with the SEC of the Proxy Statement and any Other Required Company Filing or any Other Required Parent Filing. If at any time prior to the Company Stockholder Meeting any information relating to [Mindbody], [Vista], or any of their respective Affiliates should be discovered by [Mindbody], on the one hand, or [Vista], on the other hand, that should be set forth in an amendment or supplement to the Proxy Statement, any Other Required Company Filing or any Other Required Parent Filing, as the case may be, so that such filing would not include any misstatement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, then the Party that discovers such information **will promptly notify the other**, and an appropriate amendment or supplement to such filing describing such information will be promptly prepared and filed with the SEC by the appropriate Party and, to the extent

---

[110] *Mindbody*, 2023 WL 2518149, at *44.

[111] *Id.*

[112] App. to Opening Br. at A1771 (Definitive Proxy Statement at 157).

required by applicable law or the SEC or its staff, disseminated to the Company Stockholders.[113]

The trial court also found that based on these provisions, Vista had multiple opportunities to review the Proxy Materials. Saroya and Stahl both received and reviewed a copy of the preliminary proxy statement on January 5, after which they both approved the proposed language without offering any comments or changes.[114] On January 21, Stahl and Klomhaus both received and reviewed a copy of the proposed definitive proxy statement, and neither suggested changes. The trial court concluded, therefore, that "Vista participated in the drafting of the Proxy Materials."[115]

We can infer from the trial court's analysis of participation that the court equated Vista reviewing and failing to suggest changes to the Proxy Materials with Vista actively participating in the drafting of the Proxy Materials, and by extension participating in Stollmeyer's disclosure breach. The trial court essentially states this conclusion in its final analysis of Vista's aiding and abetting liability: "Vista had an obligation to correct the material omissions discussed above and failed to do so. Vista thus withheld information from the stockholders. Vista is liable for aiding and abetting in Stollmeyer's process-based disclosure breaches."[116]

The trial court's analysis and conclusion present several novel issues for this Court on appeal. The first issue arises from the trial court's second sentence, "Vista thus withheld

---

[113] *Id.* at A1772 (Definitive Proxy Statement at 158) (emphasis added).

[114] *Mindbody*, 2023 WL 2518149, at *44.

[115] *Id.*

[116] *Id.*

85

information from the stockholders," which implies a duty of disclosure between Vista and Mindbody's stockholders. The question we confront is whether a contractual obligation between a target corporation and a third-party buyer to notify the other of potential disclosure violations creates an independent duty of disclosure between the third-party buyer and the target's stockholders that can form the basis for secondary aiding and abetting liability? We conclude that in the case before us, it does not.

We begin by noting how thin the case law is on this issue. As we explained above, we have never held a third-party arms'-length buyer liable for aiding and abetting a fiduciary breach. We have also never held that a contractual obligation and a failure to act gives rise to aiding and abetting liability. Even absent a contractual obligation, we have never held that a failure to act or mere passive awareness gives rise to aiding and abetting liability. There is no case we are aware of until this one that has imposed liability under these or similar circumstances in the corporate governance arena.

We also preface our discussion of the contract with the observation that the contractual obligation in the Merger Agreement, relied on by the trial court, was the subject of scant briefing by the parties in the proceedings below and on appeal. Thus, we address these points in a narrow fashion in an effort to resolve this case efficiently without more broadly foreclosing different outcomes based upon different facts or legal arguments that might or could be presented in future cases.[117]

---

[117] For example, we note that *In re Columbia Pipeline Group, Inc. Merger Litig.*, 299 A.3d 393 (Del. Ch. 2023) is on appeal right now and addresses similar issues with different facts.

Appellants devote only two sentences in their Opening Brief to this important issue, and argue that the trial court attempted to use Vista's contractual obligation to "bypass" the Court of Chancery rule that "[a] general duty on third parties to ensure that all material facts are disclosed, by fiduciaries to their principals" is "not a duty imposed by law or equity."[118] They also argue that there is no breach of contract claim in this case. Plaintiffs responded in their Answering Brief by describing the contractual provisions at issue and only cited the Court of Chancery's decision in *Columbia* in support of their argument, a case presently on appeal that follows and relies on the trial court's opinion in this case.[119] The briefing below by the parties was equally scant.[120]

One argument that Appellants did make in their Reply Brief on appeal is that Plaintiffs (and presumably the trial court) misread Merger Agreement § 6.3(b) by saying that Vista was obligated to "correct any material omissions in the Proxy Materials."[121] Appellants argue that the Merger Agreement did not give Vista a right to change

---

[118] Opening Br. at 46–47 (quoting *Buttonwood*, 2017 WL 3172722, at *10).

[119] Answering Br. at 36–37.

[120] Plaintiffs' Opening Post-Trial Brief had only one sentence on this issue and relied on the Court of Chancery's Motion to Dismiss Opinion in *Columbia*, which stated that because a defendant was "contractually obligated" to take action to prevent materially misleading proxy statements, it was "reasonable to infer" at the motion-to-dismiss stage that the defendant had "knowingly participated" in the alleged material omissions. *In re Columbia Pipeline Group, Inc.*, 2021 WL 772562, at *58–59 (Del. Ch. Mar. 1, 2021). Vista's Post-Trial Answering Brief also gave this point limited attention but pointed out that while reasonably conceivable that a contractual requirement to review disclosures could be sufficient to survive a motion to dismiss, such a contractual requirement does not establish an aiding and abetting claim. Post-Trial Answering Br. at 62–63, n.235.

[121] Reply Br. at 25 (quoting Answering Br. at 36; *Mindbody*, 2023 WL 2518149, at *44).

87

Mindbody's Proxy Materials, only to "review it and make suggestions."[122] Appellants ignore, however, the affirmative obligation at issue in § 6.3(d).

Turning to the Merger Agreement provisions at issue, § 6.3(b) does state that "[Mindbody] may not file the Proxy Statement . . . without first providing [Vista] and its counsel a reasonable opportunity to review and comment thereon, and [Mindbody] will give due consideration to all reasonable additions, deletions or changes suggested thereto by [Vista] or its counsel."[123] This provision gives Vista the right to review and comment on draft proxy statements, and obligates Mindbody to consider suggested changes.

Section 6.3(d), however, states that if "any information relating to [either party] should be discovered by [either party] . . . that should be set forth in an amendment or supplement to the Proxy Statement" to avoid the statement being materially misleading, "then the Party that discovers such information **will promptly notify the other**" so an appropriate supplement can be filed.[124] At a minimum, this provision creates an affirmative obligation for Vista to notify Mindbody of any information that Vista discovered, the omission of which would render the proxy statements materially misleading. As we explained, the record adequately supports that Vista knew about Stollmeyer's breach of his disclosure duty.

The question thus remains whether Vista's affirmative contractual obligation to notify Mindbody of material omissions and Vista's subsequent failure to notify constituted

---

[122] *Id.*

[123] App. to Opening Br. at A1771 (Definitive Proxy Statement at 157).

[124] *Id.* at A1772 (Definitive Proxy Statement at 158) (emphasis added).

"substantial assistance" in Stollmeyer's disclosure breaches. The trial court found that Vista "participated in the drafting of the Proxy Materials."[125] Based on our review of the record on appeal, this finding is not supported by the record evidence, and the trial court made no factual finding that Vista actively contributed to drafting or editing the Proxy Materials in any way. To the contrary, the trial court found that no one at Vista who reviewed the draft Proxy Materials suggested any changes.[126] Our law generally requires that participation for the purposes of aiding and abetting liability requires more than the passive awareness of a fiduciary's disclosure breach that would come from simply reviewing draft Proxy Materials. The trial court itself noted that "knowing participation" requires that the secondary actor "have provided substantial assistance" to the primary actor.[127]

The parties have cited no case law or other legal authority in support of the argument that a failure to act, without some kind of active role, constitutes "substantial assistance" for aiding and abetting a fiduciary breach. We have never held that it does. On these facts and with the scant briefing provided by the parties, we decline to do so now.

*RBC* is perhaps the most directly relevant precedent to the facts and claims asserted in this case. But this case is easily distinguished from *RBC*. In *RBC*, this Court held that the board breached its fiduciary duty of disclosure after being misled and "intentionally

---

[125] *Mindbody*, 2023 WL 2518149, at *44.

[126] *Id.*

[127] *Id.* (quoting *Dole*, 2015 WL 5052214, at *41) (cleaned up).

89

duped" by RBC.[128] This Court held that the board's financial advisor, RBC, aided and abetted the board's breach when RBC took advantage of the board's failure to oversee the sale process by committing "fraud on the Board."[129] Further, RBC purposefully misled the board and created an informational vacuum, which proximately caused the board's breach of its fiduciary duty of disclosure.[130] In that case, RBC knew all of the relevant information and the board knew none of it.

Here, Stollmeyer is the primary violator who breached his duty of disclosure, and unlike the board in *RBC*, Stollmeyer was not operating in an informational vacuum. On the contrary, the trial court found that Stollmeyer knew everything that Vista knew.[131] Consequently, Vista, as an alleged aider and abettor, is in a very different position in this case than RBC was in that case. Vista did not create an informational vacuum, or purposely mislead Stollmeyer, or proximately cause his disclosure breach. Stollmeyer already had all of the information that was omitted from the Proxy Materials. Vista took no action to facilitate or assist Stollmeyer in his breach, but rather passively stood by while Stollmeyer breached his disclosure duty. On these facts, Vista did not substantially assist Stollmeyer's breach.

---

[128] *RBC*, 129 A.3d at 863, 865–66.

[129] *Id.* at 865.

[130] *Id.* at 862, 865 ("[RBC] 'intentionally duped' the directors into breaching their duty of care. The record evidence amply supports the trial court's conclusion that RBC purposely misled the Board so as to proximately cause the Board to breach its duty of care."). *Id.* at 865. *See also supra* notes 74, 88.

[131] *Mindbody*, 2023 WL 2518149, at *43.

Under this Restatement factor, assessing the amount, kind, and duration of assistance that Vista gave to Stollmeyer in his disclosure breaches, we find that Vista gave no active assistance to Stollmeyer at all. This factor weighs against concluding that Vista "participated" in Stollmeyer's disclosure breach and against holding that Vista gave "substantial assistance" to Stollmeyer in his breach.

### c. The Nature of the Relationships Between the Secondary and Primary Actors

The next factor we analyze under the Restatement substantial assistance test is the nature of the relationship between Vista and Stollmeyer. Here, Vista is an arms'-length third-party buyer of Mindbody. As we explained above, when an aiding and abetting claim is brought against a third-party acquirer negotiating at arms'-length, participation should be the most difficult to prove.[132] This is because Delaware law protects arms'-length negotiations and "a bidder's attempts to reduce the sale price through arm's-length negotiations cannot give rise to liability for aiding and abetting."[133] However, liability can still attach for third parties who "create or exploit conflicts of interest in the board" or "where the bidder and the board conspire in or agree to the fiduciary breach."[134] As noted above, plaintiffs waived any claim that Vista aided and abetted the *Revlon* breach.

---

[132] *See Morgan*, 2010 WL 2803746, at *8 ("[T]he long-standing rule that arm's-length bargaining is privileged and does not, absent actual collusion and facilitation of fiduciary wrongdoing, constitute aiding and abetting helps to safeguard the market for corporate control by facilitating the bargaining that is central to the American model of capitalism."); *see also supra* notes 77–78.

[133] *Malpiede*, 780 A.2d at 1097.

[134] *Id.* at 1097–98 (citing *Gilbert*, 490 A.2d at 1058 ("[A]lthough an offeror may attempt to obtain the lowest possible price for stock through arm's-length negotiations with the target's board, it may

With respect to the substantial assistance analysis, Vista's status as a third-party bidder affords it some protection in its negotiations with potential target companies and the directors and officers of those companies.[135] This general protection afforded to Vista in this context weighs against holding that Vista gave substantial assistance to Stollmeyer in his disclosure breaches. We ask now whether § 6.3 of the Merger Agreement vitiates this protection. We think it does not.

Once the Merger Agreement was executed, Vista and Mindbody had a contractual relationship and contractual obligations to each other, including around reviewing the Proxy Materials. This means that either party could bring a breach of contract claim against the other for failure to meet contractual obligations, including the obligation to notify the other party of material omissions. Vista could have discharged its contractual duties by notifying the Mindbody board of any remaining suspected omissions after the Supplemental Disclosures were filed. But even failing to fulfil that contractual obligation and potentially subjecting itself to a breach of contract claim, we ask whether Vista's failure to notify Mindbody (of items Stollmeyer already knew) should lead to a finding that Vista is secondarily liable to Mindbody's stockholders for Stollmeyer's disclosure breaches.

This brings us back around to our more specific focus of whether Vista had an independent duty to Mindbody's stockholders, and if not, whether Vista could be liable for aiding and abetting Stollmeyer's disclosure breaches. Recall that the trial court's

---

not knowingly participate in the target board's breach of fiduciary duty by extracting terms which require the opposite party to prefer its interests at the expense of its shareholders.")).

[135] *See id.*; *see also supra* notes 77–78.

participation analysis and conclusion ended with: "Vista had an obligation to correct the material omissions discussed above and failed to do so. Vista thus withheld information from the stockholders. Vista is liable for aiding and abetting in Stollmeyer's process-based disclosure breaches."[136] The trial court's middle sentence, "Vista thus withheld information from the stockholders," implies a duty of disclosure between Vista and Mindbody's stockholders. The parties have provided us with no record-based explanation to support a conclusion that such a duty existed. Nor have we been presented with any Delaware authority to support a reading that this contractual obligation creates independent fiduciary duties between a third-party buyer and a target company's stockholders. Accordingly, we conclude that the contractual obligations in § 6.3(b) and § 6.3(d) of the Merger Agreement do not give rise to a separate duty of disclosure owed by Vista to Mindbody's stockholders. If such a duty did exist, it would potentially create direct liability for Vista to Mindbody's stockholders for any breach of its disclosure duty relating to the Proxy Statements.

Although we have found no Delaware cases on point, our examination of cases elsewhere offers some support for our conclusion that Vista's inaction, absent a duty to Mindbody's stockholders to act, does not constitute substantial assistance in Stollmeyer's disclosure breach. Many courts, in other corporate contexts, have held that a failure to act can constitute participation for aiding and abetting liability only where an independent duty

---

[136] *Mindbody*, 2023 WL 2518149, at *44.

exists between the alleged aider and abettor and the plaintiff.[137]  Scholars have also noted that "absent a duty of disclosure, possessing knowledge of the primary wrongdoer's conduct does not trigger aiding-and-abetting liability for actors who remain silent, even when doing so furthers their own interests."[138]

---

[137] *See, e.g.*, *ITT, an Intern. Inv. Trust v. Cornfeld*, 619 F.2d 909, 927 (2d Cir. 1980) ("[I]naction can create aider and abettor liability only when there is a conscious or reckless violation of an independent duty to act."); *Dillon v. Militano*, 731 F. Supp. 634, 639 (S.D.N.Y. 1990) ("Inaction may be found to be substantial assistance only where the independent duty to act was a duty owed to the [plaintiff]."); *Stander v. Fin. Clearing & Servs. Corp.*, 730 F. Supp. 1282, 1287 (S.D.N.Y. 1990) ("A simple allegation of inaction can make out a claim of aider and abettor liability 'only where there is a conscious or reckless violation of an independent duty to act.'") (quoting *Cornfeld*, 619 F.2d at 927); *In re Amaranth Natural Gas Commodities Litig.,* 587 F. Supp. 2d 513, 545 (S.D.N.Y. 2008), *aff'd*, 730 F.3d 170 (2d Cir. 2013) (same, quoting *Stander*); *Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 247 (S.D.N.Y. 1996), *aff'd*, 152 F.3d 918 (2d Cir. 1998) ("[I]naction constitutes substantial assistance only when an independent duty to act was a duty owed to the [plaintiff].  That is, inaction, or a failure to investigate, constitutes actionable participation only when a defendant owes a fiduciary duty directly to the plaintiff; that the primary violator owes a fiduciary duty to the plaintiff is not enough.") (internal citations omitted) (citing W. Page Keeton *et al.*, *Prosser & Keeton on the Law of Torts* § 46 at 323–24 (5th ed. 1984) ("Since there is ordinarily no duty to take affirmative steps to interfere, mere presence at the commission of the wrong ... is not enough to charge one with responsibility.")); *Kaufman v. Cohen*, 307 A.D.2d 113, 126 (N.Y.A.D. 2003) ("[T]he mere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff."); *In re Sharp Int'l Corp.*, 403 F.3d 43, 52 (2d Cir. 2005) (finding in the context of an alleged aiding and abetting breach of fiduciary duty claim that "silence and forbearance did not assist the [wrongful conduct] *affirmatively*") (emphasis in original); *Ryan v. Hunton & Williams*, 2000 WL 1375265, at *10 (E.D.N.Y. Sept. 20, 2000) ("[A] defendant may provide substantial assistance by failing to act only when it was required to act.  Absent a confidential or fiduciary relationship between the plaintiff and the aider and abettor, the inaction of the latter does not constitute substantial assistance warranting aider and abettor liability.") (internal citations omitted); *Glidden Co. v. Jandernoa*, 5 F. Supp. 2d 541, 556 (W.D. Mich. 1998) ("[I]n the absence of a confidential or fiduciary relationship between plaintiff and defendant giving rise to a duty of disclosure, the defendant's silence does not amount to the substantial assistance that is a required element of aider or abettor liability."); *Fremont Reorganizing Corp. v. Duke*, 811 F. Supp. 2d 1323, 1348 (E.D. Mich. 2011) (applying § 876(b) and stating that "[a] failure to act generally does not constitute substantial assistance") (citing *Glidden*, 5 F. Supp. 2d at 556–57).

[138] Deborah A. DeMott, *Fiduciary Breach, Once Removed*, 94 TEX. L. REV. SEE ALSO 238, 241 (2016).

Plaintiffs did not bring a breach of fiduciary duty claim against Vista. They brought a breach of fiduciary duty claim against Stollmeyer. They brought an aiding and abetting claim against Vista based on Stollmeyer's breach of his fiduciary duty of disclosure. The requirements of the two claims are different. An aiding and abetting claim, as explained above, is one of the most difficult claims to prove and requires a showing of both *scienter* and substantial assistance to the primary actor amounting to participation in that actor's breach. These exacting requirements would be diluted by implying that contractual rights and obligations related to proxy disclosures between merger partners create an independent duty of disclosure between Vista and Mindbody's stockholders.

Finally, there are also compelling public policy reasons not to read contractual disclosure-based obligations between a third-party buyer and a target company as implying independent fiduciary duties between the third-party buyer and the target's stockholders. Such a duty would collapse the arms'-length distance between the third-party buyer and the target, forcing the buyer to consider its duty to the target's stockholders instead of to its own stockholders. Moreover, such a duty would require a potential third-party bidder to second-guess the materiality determinations and legal judgment of the target's board of directors, which already owes fiduciary duties to its stockholders.

For these reasons, the nature of the relationships between Vista, Stollmeyer, and Mindbody also weighs against a finding that Vista gave "substantial assistance" to Stollmeyer in his disclosure breach.

### d. Vista's State of Mind

We read this final factor from the Restatement "substantial assistance" test as concerning the other knowledge requirement for a finding of *scienter*: the requirement that the aider and abettor must know that *its own* conduct was legally improper. [139]

Above, we reviewed the evidence upon which the trial court based its finding of *scienter*. Without disturbing the fact findings, although some omissions are more "severe" than others, we affirmed the finding of a disclosure violation. In assessing *scienter*, the less obvious the violation, the harder it is to find that a third-party buyer, acting at arms'-length, acted with *scienter* as to both the primary party's conduct and its own conduct.

Focusing on the three partial omissions and four complete omissions, the trial court largely based its finding of Vista's *scienter* on the fact that Vista "scrubbed" this same "incriminating" information from its own internal Investment Committee materials.[140] This "scrubbing" consisted of Stahl texting Klomhaus, another member of the deal team, before the Investment Committee meeting where the deal team would seek internal approval to bid on Mindbody to tell Klomhaus not to "tell them about process."[141] The deal team then changed the slide deck before the Investment Committee presentation, altering a bullet point on the slide that gave transaction background from "Late October 2018: Qatalyst Partners calls Vista to indicate that Mindbody will come to market" to

---

[139] *RBC*, 129 A.3d at 861; *see supra* Section V.C.2.a (discussing the law of *scienter* and the two types of knowledge required for a finding of *scienter*).

[140] *Mindbody*, 2023 WL 2518149, at *44.

[141] *Id.*

"November 30, 2018: Qatalyst Partners informs Vista that Mindbody has retained them as advisor on a potential sell-side transaction."[142] The trial court also found that Vista "changed the deal-team memorandum" that accompanied the Investment Committee presentation "to omit an entire paragraph about Stollmeyer's interactions with Vista from August through November."[143]

The only other evidence the trial court found that went to Vista's *scienter* was Stahl's text to Saroya after Mindbody filed its preliminary proxy statement to "remind him to stick to this story that 'Jeff called you on 11/30 inviting us into the process.'"[144] The actual text message only says, however, "Jeff called you on 11/30 inviting us into the process," without any other context or text messages.[145] The trial court's factual findings thus largely center around omissions in Vista's internal materials prepared for its own Investment Committee meeting—almost a month before Mindbody drafted its Proxy Materials.

There are many possible reasons that some employees of a company might frame the narrative of a deal in a particular way to the Investment Committee of their own company—perhaps to avoid extraneous detail that might distract the committee, perhaps because the process did not follow their own internal best practices, or perhaps to clean up

---

[142] *Id.*; App. to Answering Br. at B234, B282.

[143] *Mindbody*, 2023 WL 2518149, at *44. This appears to be not entirely accurate. The paragraph in the deal-team memorandum was edited to remove some detail, and other detail was added, but the paragraph is not omitted from the final version. For a comparison of the two paragraphs, see App. to Answering Br. at B360 and Trial Ex. JX-1462 at 1.

[144] *Mindbody*, 2023 WL 2518149, at *44 (quoting Trial Ex. JX-1066); App. to Answering Br. at B333.

[145] App. to Answering Br. at B333.

their paper trail.[146] We agree with the trial court that such changes, and even use of the word "scrubbing" to describe its actions, indicates that Vista had at least some awareness that its own actions during the sale process were not above suspicion. However, whatever the reason for the deal team removing some details and adding others in its own internal documents, this evidence does not adequately support a finding of *scienter* and aiding and abetting liability for the proxy disclosure violations.

The remaining text message from Stahl to Saroya after the preliminary proxy statement, "Jeff called you on 11/30 inviting us into the process[,]" does not, in our view, fill the evidentiary gap. The trial court summed up its analysis of Vista's knowledge by saying: "Vista hid these details precisely because they did not reflect well on them. This all sheds light on Vista's knowledge."[147]

The trial court may well be correct that Vista hid such details because they did not reflect well on Vista. Vista may have been aware that some of its conduct during the sale process was not above suspicion. But the knowledge that matters for the second prong of *scienter* is knowledge that the aider and abbettor's (Vista's) *own* conduct wrongfully assisted the primary violator (Stollmeyer) in his disclosure breach, not his sale-process *Revlon* breach. The trial court made no finding that indicated that Vista knew that its failure to abide by its contractual duty to notify Mindbody of potential material omissions in the

---

[146] The trial court did not make an explicit finding, supported by evidence, as to why these references were removed.

[147] *Mindbody*, 2023 WL 2518149, at *44.

Proxy Materials was wrongful and that its failure to act could subject it to liability to Mindbody's stockholders.

As we have said, the question of whether a defendant acted with *scienter* is a factual determination. We have found no basis to find that Vista had an independent duty to Mindbody's stockholders. The record evidence cited by the trial court, largely consisting of Vista's edits to its own internal memoranda, does not adequately support a finding that Vista knew that *its own* conduct wrongfully contributed to Stollmeyer's disclosure violations. As to the fourth factor in the Restatement substantial assistance test, Vista's state of mind, this factor does not weigh in favor of finding that Vista substantially assisted Stollmeyer in his breach of his duty of disclosure.

Ultimately, after assessing the various Restatement factors and evaluating them in a wholistic fashion, we hold that the record does not sufficiently support a determination that Vista's conduct rises to the level of "substantial assistance" or "participation" in Stollmeyer's breach. Consequently, plaintiffs have failed to prove that Vista aided and abetted Stollmeyer's disclosure breach. Accordingly, we reverse the holding of the trial court and hold that Vista is not liable for aiding and abetting Stollmeyer's breach of his duty of disclosure.

D.    *The Revlon Breach Damages*

This Court "review[s] findings as to damages by the Court of Chancery for an abuse of discretion."[148] The Court of Chancery has the power "to grant such . . . relief as the facts

---

[148] *RBC*, 129 A.3d at 866 (citing *Gotham Partners, L.P. v. Hallwood Realty Partners*, 817 A.2d 160, 175 (Del. 2002)).

99

of a particular case may dictate."[149] "As long as there is a basis for an estimate of damages, and the plaintiff has suffered harm, mathematical certainty is not required."[150]

The trial court accepted Plaintiffs' lost-transaction theory of damages but rejected Plaintiffs' suggested transaction price of $40 per share as having an insufficient evidentiary basis.[151] Although Vista did have authorization to bid up to $40 per share, there was no indication in the record that Vista would have actually bid that amount and $40 was at the upper limit of Vista's modeling. The trial court found that if Mindbody had been able to introduce competition it was possible Vista might have paid $40 per share, but Vista also could have declined to go that high. On the other hand, the trial court found that "the most compelling evidence" as to the price Vista would have actually paid was "internal Vista bets" from employees betting on what the ultimate deal price was likely to be. In a range from $36.50 (the then-current offer) to $40 (the upper price limit), various Vista employees guessed the final deal price. The line was at $37.50 with one employee betting on the line and more than half betting the deal would close higher than $37.50 per share. These findings are largely based on a photograph of a Post-it note that Stahl texted to Saroya, which drew the line at $37.50 and noted what each employee's bet was.[152] Stahl's name is written on the Post-it with a bet of $37.26.

---

[149] *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1251 (Del. 2012) (quoting *Weinberger v. UOP, Inc.*, 457 A.2d 701, 714 (Del. 1983)).

[150] *In re Southern Peru Copper Corp. S'holder Derivative Litig.*, 52 A.3d 761, 814 (Del. Ch. 2011), *aff'd*, 51 A.3d 1213 (Del. 2012) (quoting *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1184 (Del. Ch. 1999), *aff'd*, 766 A.2d 437 (Del. 2000)) (internal citations omitted).

[151] *Mindbody*, 2023 WL 2518149, at *46.

[152] App. to Opening Br. at A1455.

Defendants observe that the trial court "makes much of a Post-it note" and it does.[153] But the Post-it note was not the only evidentiary basis for finding a lost-transaction price of $37.50 per share. Importantly, the trial court also found that "[t]wo of Vista's most informed deal team members believed that the deal price was likely to be $37.50."[154] To support this finding, the trial court cited to the string of text messages that followed Stahl sending the photograph of the Post-it note to Saroya.[155] In these text messages, after Stahl sent the photograph to Saroya, Saroya responded with "37.5 is a good guess" and Stahl replied, "I thought so too."[156] These text messages from Stahl and Saroya show that a deal price of $37.50 was not just rampant speculation on the part of Vista employees or the trial court, but a realistic, even likely, possible outcome. It is evidence that, as the trial court found, if Stollmeyer had not corrupted the process, Vista would have paid $37.50 per share.

Had the Post-it note stood alone, without the affirming text messages of Saroya and Stahl, it likely would not have been enough. But the trial court had broad discretion to fashion a remedy particular to the facts of this case so long as there was some evidentiary basis for that determination, and there is enough of a basis here that we will not find that the trial court abused its discretion. Accordingly, notwithstanding some misgivings about the thinness of the evidence, we affirm the trial court's award of $1 per share in damages for Stollmeyer's duty of loyalty breach.

---

[153] Opening Br. at 38.

[154] *Mindbody*, 2023 WL 2518149, at *46.

[155] App. to Opening Br. at A1454–61.

[156] *Id.* at A1456, A1458.

*E.    The Disclosure Breach Damages*

Given that we have held that Vista is not liable for aiding and abetting, given that Plaintiffs are entitled to only one recovery of $1 per share in damages, and given that we have upheld the damages award for the *Revlon* breach, we need not reach this issue.

*F.    Defendants Waived Their Right to Seek a Settlement Credit*

The final issue on appeal is whether the trial court correctly held that Defendants waived their right to seek a settlement credit under the Delaware Uniform Contribution Among Tortfeasors Act ("DUCATA").  DUCATA codified the right of contribution among joint tortfeasors and created the legal framework that applies when a plaintiff releases only some joint tortfeasors through a settlement.[157]  Under DUCATA, a release of some joint tortfeasors does not discharge the non-settling joint tortfeasors unless the release so provides, but instead reduces the claim against the remaining tortfeasors "in the amount of the consideration paid for the release, or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid."[158]

After the trial court issued its post-trial opinion, Defendants asked the trial court to apply DUCATA to reduce the total damages award in the amount of the $27 million consideration that the Settling Defendants paid.  Plaintiffs did not dispute that if the Settling Defendants were joint tortfeasors, then Defendants were entitled to a credit equal to the

---

[157] 10 *Del. C.* § 6302.

[158] 10 *Del. C.* § 6304(a).

$27 million settlement consideration. Instead, Plaintiffs argued that a settlement credit was inappropriate because Defendants waived their right to seek a credit when they failed to raise the argument before their post-trial answering brief. After a thorough and well-reasoned analysis of waiver in the settlement credit context, the trial court held that Defendants waived their right to seek a settlement credit under DUCATA.[159] We agree.

We review "questions of statutory construction"[160] and "the Court of Chancery's conclusions of law *de novo*."[161]

### 1. The Law of Waiver in the Settlement Credit Context

"Issues not briefed are deemed waived."[162] "The general rule . . . that a party waives any argument it fails properly to raise shows deference to fundamental fairness and the common sense notion that, to defend a claim or oppose a defense, the adverse party deserves sufficient notice of the claim or defense in the first instance."[163] The trial court summarized the Court of Chancery's long-running struggle to define when a defendant has waived its ability to seek a settlement credit. This struggle "stems in part from the tension between the competing desires of avoiding trial by ambush" on the one hand and the awkwardness of "forcing defendants to present evidence on joint tortfeasor status at a

---

[159] *November Opinion*, 2023 WL 7704774, at *6.

[160] *Ikeda v. Molock*, 603 A.2d 785, 786 (Del. 1991).

[161] *RBC*, 129 A.3d at 869.

[162] *Emerald Partners v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) (citing *Murphy v. State*, 632 A.2d 1150, 1152 (Del. 1993)).

[163] *PharmAthene, Inc. v. SIGA Techs., Inc.*, 2011 WL 6392906, at *2 (Del. Ch. Dec. 16, 2011) (internal citation omitted).

bench trial" while also arguing they should not be held liable.[164]  There are two relevant cases from this Court and the Court of Chancery that illustrate this underlying tension involving joint tortfeasors and provide guidance, *Ikeda v. Molock*[165] and *In re Rural/Metro Corp. S'holders Litig.*[166]

This Court held in *Ikeda* that, in the context of a *jury trial*, a defendant seeking damages based on relative fault must file a cross-claim against settling tortfeasors *before* trial to allow the jury to make factual findings related to that claim.[167]  *Ikeda* was a medical malpractice suit in which a defendant moved to amend his pleadings on the morning of trial to assert cross-claims against the two defendants that had settled with the plaintiff.[168] The trial court denied the defendant's motion and held that because no cross-claims had been filed, the jury would not be instructed to prorate damages based upon the fault attributable to the settling defendants.  On appeal, this Court reversed, holding that the defendant was entitled to amend his pleadings to assert cross-claims against the two settling defendants and that a defendant seeking damages based on relative fault *must* file a cross-claim against settling joint-tortfeasors *before* trial to allow the jury to make factual findings

---

[164] *November Opinion*, 2023 WL 7704774, at *4.

[165] 603 A.2d 785 (Del. 1991).

[166] 102 A.3d 205 (Del. Ch. 2014), *aff'd*, 129 A.3d 816 (Del. 2015).

[167] *Ikeda*, 603 A.2d at 787 (observing that "10 *Del. C.* § 6306(d) requires the filing of a cross-claim between parties to the litigation before a jury may prorate liability based upon proportionate fault[,]" and "[a]ccordingly, the filing of a cross-claim is a prerequisite to the apportionment of liability between joint tort-feasors based upon relative degrees of fault.").

[168] *Ikeda*, 603 A.2d at 785–86.

concerning that claim.[169]

*Rural/Metro* addressed whether the requirements of *Ikeda* applied in bench trials. *Rural/Metro* involved a stockholder class action lawsuit against directors of a corporation for breach of fiduciary duty stemming from the sale of a corporation and against the investment bank (RBC) for aiding and abetting the breaches. Prior to the trial, all of the defendants but RBC settled with the plaintiffs.[170] RBC then filed a cross-claim against the settling defendants requesting that the court reduce the damages recoverable against RBC under DUCATA based upon their relative degrees of fault.[171] RBC's cross-claim did not allege any wrongdoing by the settling defendants or contend that "any of the individual [settling defendants] were joint tortfeasors and liable to the plaintiffs for money damages."[172] Thus, the plaintiffs argued that RBC had waived its right to argue in post-trial proceedings that the settling defendants were joint tortfeasors.[173] The Court of Chancery disagreed with the plaintiffs and concluded that RBC had not waived its right to argue post-trial that the settling defendants were joint tortfeasors and that damages should be allocated according to fault. Instead, the "[plaintiffs] simply had to do so based on the

_____

[169] *Id.* at 787 (observing that "[t]he conclusion that 10 *Del. C.* Ch. 63 requires a cross-claim to be filed before a jury may determine relative degrees of fault is further supported by the proposition that juries should not determine matters which are not litigated before them[,]" and that "[a] jury may not properly fulfill its role as trier of fact unless the questions to be decided by the jury are litigated at trial.").

[170] *See Rural/Metro*, 102 A.3d at 217–18.

[171] *Id.* at 216–17.

[172] *Id.* at 217 ("Consistent with the stipulation, RBC's cross-claim did not actually allege any wrongdoing by the [settling defendants] that could give rise to liability to the Class.").

[173] *Id.* at 244.

record created at trial and in light of the factual findings in the [post-trial opinion]."[174] This Court affirmed.[175]

Accordingly, under *Rural/Metro*, a non-settling defendant's failure to prove joint tortfeasor status at a bench trial does not automatically prohibit them from seeking a DUCATA settlement credit post-trial. However, as the trial court correctly noted, "the question remains whether the waiver doctrine should preclude a settlement credit under the circumstances of this case."[176] We agree with the trial court that the waiver doctrine precludes a settlement credit based on the facts of this case.

### 2. Defendants Waived Their Right to Seek a Settlement Credit under DUCATA by Not Timely Raising the Issue

The Non-Settling Defendants waived their ability to seek a settlement credit because they did not raise this issue until the last footnote (footnote 493) on the very last page (page 121) of their very last post-trial brief. This is distinguishable from *Rural/Metro*, in which RBC (the non-settling defendant) filed a cross-claim and raised the settlement credit issue in the *pre-trial* stipulation and order.[177] In the context of the trial court's waiver analysis in this case, the trial court reasoned that RBC's actions in *Rural/Metro* "though relatively ministerial, were the bare minimum necessary to place the plaintiffs on notice that RBC intended to claim a settlement credit, which gave the plaintiffs the opportunity to defend

---

[174] *Id.* at 245.

[175] *RBC*, 129 A.3d at 871 ("Given that this case involved a bench trial, however, RBC acknowledges that the Court of Chancery correctly determined that RBC did not waive its right to argue during post-trial proceedings that the settling defendants were joint tortfeasors.").

[176] *November Opinion*, 2023 WL 7704774, at *5.

[177] *Rural/Metro*, 102 A.3d at 216–17.

106

against this possibility."[178]

Additionally, the Non-Settling Defendants' decision not to raise this issue until the last footnote of the last page of their final post-trial briefing would conflict with "fundamental fairness" and the "common sense notion that, to defend a claim or oppose a defense, the adverse party deserves sufficient notice of the claim or defense in the first instance."[179] As noted by the trial court, the Non-Settling Defendants' failure to raise the DUCATA issue influenced Luxor's strategy at trial:

> At trial, Luxor elicited testimony that would speak to the Settling Defendants' joint tortfeasor status. . . . It is hard to believe that Luxor would have gone so aggressively after [the settling defendants] had they known that they would have [been] stuck later defending the actions of [the settling defendants] to avoid a settlement credit under DUCATA.[180]

In other words, had the Non-Settling Defendants raised their intention to seek a settlement credit under DUCATA, Luxor would have likely pursued a different trial strategy. This seems like the quintessential context justifying a finding of waiver.

Next, contrary to Appellants' assertion, it is not readily apparent that the Non-Settling Defendants signaled their intention of seeking a settlement credit under DUCATA based on the language in the Settlement Agreement.[181] Appellants point out that the settlement agreement signed by the settling defendants (the "Settlement Agreement") states the following:

---

[178] *November Opinion*, 2023 WL 7704774, at *5.

[179] *PharmAthene*, 2011 WL 6392906, at *2

[180] *November Opinion*, 2023 WL 7704774, at 5.

[181] *See* B545–B592 (Stipulation and Agreement of Settlement, Compromise, and Release with Defendants Liaw and IVP Entities at 1–48) [hereinafter "Settlement Agreement"].

107

> [A]ny joint damages recoverable against all other alleged tortfeasors, including Non-Settling Defendants, will be reduced by the greater of (a) the Settlement Amount, and (b) the pro rata share of the responsibility for such damages, if any, of Settling Defendants, *should it be determined that any of the Settling Defendants are joint tortfeasors*.[182]

Although this excerpt signals that the Non-Settling Defendants intended to seek a settlement credit, it is contradicted by a later portion of the Settlement Agreement, in which the settling defendants explicitly refused to admit liability.[183]

The settling defendants refused to admit any wrongdoing and the trial court did not determine whether they were joint tortfeasors. Thus, because DUCATA only applies to settlements among joint tortfeasors, the failure of the Non-Settling Defendants to timely submit the issue of joint tortfeasor status to the trier of fact supports Appellees' argument for waiver.[184]

This Court addressed a similar scenario in *RBC*. Specifically, on appeal, RBC took issue with the Court of Chancery's opinion adjudging liability in which it required RBC to litigate its contribution claims upon the record created at trial in light of the factual findings.[185] This Court, however, was unconvinced by RBC's argument and did not relieve RBC "of its burden" to prove the joint tortfeasor status of the other settling defendants:

---

[182] B570 (Settlement Agreement at 26) (emphasis added).

[183] *See* B579–B580 (Settlement Agreement at 35–36) ("NO ADMISSION OF WRONGDOING").

[184] *See RBC*, 129 A.3d at 871 ("RBC contends that Section 6306(d) requires actual litigation between the joint tortfeasors before proceeding on anything other than a *pro rata* basis. This Court has stated that when one or more pretrial settlements have occurred, joint tort[ ]feasor status is . . . resolved judicially by submitting the liability of a settling defendant to the trier of fact for a determination.") (internal quotation marks and citations omitted) (quoting *Med. Ctr. of Del., Inc. v. Mullins*, 637 A.2d 6, 9 (Del. 1994)).

[185] *Id.*

To the extent that RBC claims prejudice due to the timing of the eve-of-trial settlements between the plaintiffs and all other defendants, that is simply a function of RBC being the last non-settling defendant. This situation does not relieve RBC of its burden to prove the joint tortfeasor status of the other defendants. After the agreements in principle were reached, the settling defendants remained parties to the action for purposes of trial. RBC had the opportunity to develop a record in support of its contribution claims at trial. Three of the individual defendants testified at trial. RBC could have issued trial subpoenas as to the others. RBC was permitted to file a post-trial brief in support of its contribution defenses. Further, the settling defendants were not released from the case until six months after trial and RBC did not object to the settlement or to the entry of the Partial Final Judgment.

. . . .

Nor would the settling defendants be "tortfeasors" as a result of the settlement. In *Medical Center of Delaware, Inc. v. Mullins*, we concluded that a release providing for a reduction in a plaintiff's recovery in accordance with Section 6304 does not establish a settling defendant as a joint tortfeasor by its nature. *In other words, a release, absent an admission, is insufficient to establish a settling defendant as a joint tortfeasor.* As the Court of Chancery observed, DUCATA applies only to joint tortfeasors. [The settling defendants] were not adjudicated joint tortfeasors, nor did the Settlement Stipulation or Partial Final Judgment contain an admission of liability establishing them as such. *Accordingly, here, as in Mullins, the applicable release predicated any settlement reduction upon an adjudication of the settling defendants' liability as joint tortfeasors. Thus, the trial court correctly concluded that the settlement did not establish the joint tortfeasor status of the settling defendants.*[186]

In this case, as in *RBC*, the Non-Settling Defendants' were not relieved of their burden to prove the joint tortfeasor status of the other defendants.

But the Non-Settling Defendants did not explicitly raise the settlement credit issue until the last footnote of the last page of their final post-trial brief. It seems unlikely that raising this issue in a last-minute, extraneous footnote can be considered "squarely raising"

---

[186] *Id.* at 871–72 (internal citations omitted) (emphasis added).

the issue in this context. Moreover, contrary to Appellants' characterization, the trial court did not break "new ground in holding that a party in a bench trial must preserve the setoff issue pre-trial, even though it will be addressed post-trial."[187] Instead, the trial court merely assessed the facts of this case and determined that, following our guidance set forth in *RBC*, the Non-Settling Defendants did not fairly apprise Luxor that they intended to seek a settlement credit under DUCATA.[188]

Accordingly, the trial court did not err in determining that the Non-Settling Defendants, by their pre-trial silence, waived the right to establish post-trial that the settling defendants were joint tortfeasors for purposes of DUCATA.

## VI. CONCLUSION

For the reasons set forth herein, we AFFIRM in part and REVERSE in part.

---

[187] Opening Br. at 52.

[188] Additionally, as the trial court pointed out, because the trial court held that Plaintiffs had waived their claim that Vista aided and abetted Stollmeyer's sale process breaches by failing to adequately preserve the claim prior to trial, there was parity in also holding that the Non-Settling Defendants waived their right to seek a settlement credit after failing to adequately raise the issue prior to trial. *See November Opinion*, 2023 WL 7704774, at *6.

110